WILLIAM COLBY *v.* ALEXANDER BURNHAM
(11433)

O'CONNELL, FREEDMAN and SCHALLER, Js.

Argued March 26—decision released June 29, 1993

*Thomas M. Cassone,* with whom, on the brief, were *Robert S. Bello, Lawrence M. Lapine* and *Christopher R. Bello,* for the appellant (defendant).

*Jonathan A. Flatow,* for the appellee (plaintiff).

FREEDMAN, J. This is a contract action involving the termination of a coauthorship agreement to produce Lost Victory, a book on the involvement of the United States in the war in Vietnam. The trial court rendered judgment pursuant to a referee's corrected report finding that the defendant failed to perform his obligations under the agreement between the parties in a timely

manner and awarding the plaintiff $23,000 in damages.[1] On appeal, the defendant claims that the attorney trial referee improperly (1) found that the defendant had breached the agreement by failing to perform within an implied reasonable time when a controlling express time for performance had yet to expire, (2) found that an implied reasonable time for performance had already expired when the plaintiff declared the coauthorship agreement to be terminated, (3) found that the defendant had breached the agreement by failing to perform within an implied reasonable time when the plaintiff had tried and briefed the case under a different legal theory, (4) awarded damages to the plaintiff, and (5) calculated the amount of the plaintiff's damages. We affirm the judgment of the trial court.

This case was tried to an attorney trial referee. The attorney trial referee issued a report, which was subsequently corrected after a motion was filed by the defendant pursuant to Practice Book § 438. After motions by the defendant excepting to the findings of fact in the referee's corrected report and objecting to the acceptance of the referee's corrected report, the trial court rendered judgment in accordance with the corrected report.

The record reveals the following. In 1983, the plaintiff, a former Central Intelligence Agency (CIA) offi-

[1] The trial court also rendered judgment for the plaintiff on the defendant's counterclaim alleging in one count that the plaintiff had breached the contract between the parties by terminating their coauthor relationship and seeking, in a second count, quantum meruit recovery for the writing services the defendant had provided to the plaintiff before the plaintiff terminated their coauthor relationship. With respect to the latter claim, the attorney trial referee found that the "[d]efendant has provided no evidence for the reasonable value of the services he provided. However, it is reasonable to conclude that the value of those services is less than the $7000 which [the] defendant will retain ($30,000 advance [paid to him] by [the] Publisher less [the] judgment in favor of [the] plaintiff of $23,000)."

The defendant does not challenge the court's judgment with respect to his counterclaim in this appeal.

cer and later the director of the CIA, undertook to write a book about the Vietnam war. The plaintiff wanted to give a sixteen year chronology regarding his experiences in Vietnam between 1959 and 1975. The plaintiff was unable to interest the agent and publisher of his earlier work, Honorable Men, in this new project. The plaintiff then entered into a coauthorship agreement with Anthony Cave Brown, and MacMillan Publishing Company in mid-1983 to produce the book. In early 1986, however, MacMillan terminated the agreement due to problems with the manuscript.

The plaintiff continued to work on the manuscript. Later in 1986, the plaintiff found another coauthor, James McCargar. Although the plaintiff did not have a literary agent or publisher, he agreed with McCargar that they would share equally any proceeds upon the publication of the book. The plaintiff eventually discharged McCargar in 1987 because he was dissatisfied with the speed of McCargar's work. The plaintiff agreed with McCargar's agent that the work produced by McCargar was worth $10,000, payable $5000 at the termination of their working relationship and $5000 from any proceeds from the book.

In the summer of 1987, the plaintiff contacted the defendant and discussed working with him on the book. At that time, the plaintiff supplied the defendant with an initial draft of the proposed book. The plaintiff also informed the defendant that, pursuant to an agreement between the plaintiff and the CIA, any literary work produced by the plaintiff that dealt with intelligence matters had to be submitted to the CIA for its review and clearance. A substantial portion of the book contemplated by the parties was to deal with such matters.

In the fall of 1987, with the assistance of Robert Eringer, a literary agent, the parties entered into a "memorandum of intent," setting forth the understand-

ing and obligations of the parties regarding their work together on the book.[2] The defendant then began working on transforming the plaintiff's manuscript into a book suitable for publication.

In December, 1987, the parties entered into a written agreement with Contemporary Books, Inc. (publisher), for the publication of the book. The agreement provided for a $100,000 advance to be paid one third on signing, one third on acceptance of the manuscript and one third on publication. The agreement further provided that the parties' manuscript would be delivered to the publisher by March 30, 1988. Although this deadline was unrealistically early, the book could have been published on the fall 1988 "list."[3] This necessitated the completion of a good quality manuscript by early or midspring, 1988.

On January 14, 1988, the parties entered into a written agreement whereby the defendant would receive

[2] The parties' memorandum of intent provides in pertinent part: "It is the understanding of the undersigned that Alexander Burnham will assist in the writing and editing of a book by William Colby, the subject of which is the war in Vietnam.

"William Colby agrees to provide Alexander Burnham with an initial manuscript and an oral account of all incidents necessary for the completion of the project. It will be the duty of Alexander Burnham to prepare a second and third draft of the manuscript in a form for submission to the publisher.

"The parties agree that William Colby and Alexander Burnham will share equally all earnings generated by the publication.

"Parties agree that William Colby and Alexander Burnham shall be credited as co-authors for the publication.

"Both parties agree that the terms of the above memorandum will remain in effect and will be a basis for any subsequent agreements which may be entered into at such time as the publisher's contract is executed.

"Both parties agree to appoint Robert Eringer as their sole and exclusive agent for this book. In consideration for services rendered, the said agent is entitled to receive as [his] commission ten percent (10%) of gross earnings generated by this book."

[3] There are two lists of book publications. One is the fall list, and the other is a spring list. For inclusion on the fall list, the submission of a good quality manuscript by early spring of the year of publication is required.

the entire first payment on the advance. It is standard in the publishing industry for the first installment of the publisher's advance, where one author in a coauthor relationship is a professional writer, to go to the professional writer. In addition, the defendant was in need of the money. The following month, the defendant received his share of the first advance payment, which totaled $30,000 after Eringer was paid his 10 percent agent fee.

The January 14 agreement also provided that "[i]n the event that any of these funds must be repaid to Contemporary Books, Inc., under the contract, the repayments will be proportional to the amount of the funds received between Burnham and Colby." This provision, however, never became effective because at no time did the publisher require a refund of the $30,000 advance payment.

At the end of January, 1988, the defendant sent to the plaintiff approximately sixty pages of a second draft manuscript. The sixty pages of material were in a form suitable for submission to the publisher but covered only one-sixteenth of the proposed subject matter of the book. Thereafter, the defendant stopped producing manuscript in any serious quantity.

The parties failed to meet the March 30, 1988 deadline to provide the publisher with a manuscript. The publisher made no claim for damages as a result of this breach. Thereafter, the publisher and the parties extended the deadline set forth in their agreement to April 30, 1988. The parties failed to meet this deadline as well. By letter dated May 20, 1988, the publisher unilaterally extended the parties' deadline for producing an acceptable manuscript to August 30, 1988. At that time, the publisher also altered the terms of its agreement with the parties to provide that the book would be scheduled for publication on the spring 1989

list, rather than the fall 1988 list as originally agreed. Publication of this book on the fall 1988 list was important for marketing reasons.

On June 7, 1988, the entire manuscript prepared by the defendant consisted of ninety-three pages and covered the subject matter only to May, 1961. Moreover, this manuscript was not suitable for submission to the publisher. The plaintiff declared the defendant in breach of contract on June 7, 1988.

Thereafter, the plaintiff rehired McCargar as coauthor. The plaintiff agreed to share any book proceeds equally with McCargar. A manuscript was delivered to the publisher in the fall of 1988 but was not accepted by it until April, 1989. The book Lost Victory was published in November, 1989, but has not generated enough revenue to offset the advance payment and to generate additional royalties.

Additional facts are set forth where they are relevant.

I

## LIABILITY

The defendant first claims that the trial court improperly rendered judgment on the referee's corrected report because the referee improperly found that the defendant had breached the coauthorship agreement by failing to perform within an implied reasonable time when a controlling express time for performance had yet to expire. The defendant contends that the parties' contract with the publisher established August 30, 1988, as the deadline for performance of the coauthorship. The defendant claims that the referee improperly failed to read the parties' agreement with the publisher together with the two other written agreements signed by the parties alone in determining the parties' intent with respect to the time for performance. We disagree.

"To give meaning to contracts, courts interpret the intent of the parties by construing the whole contract and all relevant provisions together. . . . In construing contract terms, the court seeks to effectuate the intent of the parties. . . . To ascertain the parties' intent, the courts consider not only the language used in the contract but also the circumstances surrounding the making of the contract, the motives of the parties and the purposes which they sought to accomplish." (Citations omitted; internal quotation marks omitted.) *Harvey* v. *Daddona,* 29 Conn. App. 369, 375, 615 A.2d 177 (1992). The intent of the parties is normally a question of fact for the trier; *Connecticut National Bank* v. *N. E. Owen II, Inc.,* 22 Conn. App. 468, 474, 578 A.2d 655 (1990); which we will not disturb unless it is "clearly erroneous." Id.

"In considering the expressed intent of a contract evidenced . . . by multiple writings, all of the writings should be considered and an endeavor made to ascertain the expressed intent of the contract as a whole." *Schubert* v. *Ivey,* 158 Conn. 583, 587, 264 A.2d 562 (1969). Because the referee was urged by both parties to consider all of the various documents signed by them, it properly did so. Nonetheless, the referee found that neither the memorandum of intent taken alone; see footnote 2, supra; nor the various documents construed together established a time for performance by the defendant of his contractual obligation to produce a second and a third draft of the manuscript. The referee specifically declined to find that the defendant's deadline for performance coincided with the August 30 deadline established by the publisher for performance by the plaintiff and the defendant. Instead, the referee concluded that the defendant's time to perform his obligations to the plaintiff "was at a time sufficiently in advance of August 30, 1988 [so] that a second and third draft manuscript could have been reviewed by the plain-

tiff, modified and put into final form, submitted to the CIA for approval, and *then* presented to the publisher by August 30, 1988." (Emphasis added.) Thus, the referee properly recognized that the publisher's deadline marked the end of the prepublication process. That deadline was to occur *after* the defendant had performed his contractual obligations. Consequently, the defendant's performance was necessarily due at some point in advance of the publisher's deadline, and the referee properly concluded that the agreement between the parties as expressed in the several documents contained no express provision regarding the defendant's time of performance.

The defendant next argues that, even if the contract did not contain an express provision regarding his time for performance, the referee improperly determined that the defendant's time for performance under the contract had already expired when the plaintiff terminated his coauthor relationship with the defendant on June 7, 1988. We disagree.

" 'Where no time for the performance of a contract is contained within its terms, the law presumes that it is to be performed within a reasonable time. *Texas Co.* v. *Crown Petroleum Corporation,* 137 Conn. 217, 277, 75 A.2d 499 [1950]; *Santoro* v. *Mack,* 108 Conn. 683, 689, 145 A. 273 [1929].' *Benassi* v. *Harris,* 147 Conn. 451, 458, 162 A.2d 521 (1960); see also *Central New Haven Development Corporation* v. *LaCrepe, Inc.,* 177 Conn. 212, 216, 413 A.2d 840 (1979). 'What is a reasonable length of time is ordinarily a question of fact for the trier. *International Tool & Gauge Co.* v. *Borg,* 145 Conn. 644, 648, 145 A.2d 750 [1958]; *Loomis* v. *Norman Printers Supply Co.,* 81 Conn. 343, 347, 71 A. 358 [1908].' *Parkway Trailer Sales, Inc.* v. *Wooldridge Bros., Inc.,* 148 Conn. 21, 26, 166 A.2d 710 (1960)." *Martin* v. *Martin's News Service, Inc.,* 9 Conn.

App. 304, 308–309, 518 A.2d 951 (1986), cert. denied, 202 Conn. 807, 520 A.2d 1287 (1987).

Here, the referee concluded that while "[i]t is impossible to state with exactitude when the reasonable time within which [the] defendant had to perform his duties under the contract between him and the plaintiff had expired . . . [however] as of June 7, 1988, such reasonable time had expired." This finding is supported by the evidence adduced at trial, which showed that publication of the book on the fall 1988 list was important for marketing and that, in order to accomplish this goal, the parties had to submit a good quality manuscript to the publisher, after compliance with CIA prepublication clearance procedures, by midspring, 1988, at the latest.

The defendant points to two facts that, he contends, undermine the referee's finding that his reasonable time for performance had expired by June 7, 1988: (1) the plaintiff spent more time working on the book with other individuals than he did with the defendant, and (2) the trial court could not find that the defendant would have ultimately failed to provide a suitable manuscript in order to permit the parties to meet the publisher's August 30, 1988 deadline, although it did find such an outcome extremely unlikely. Both of these factual considerations, while relevant to the question of when the defendant should reasonably have been expected to have performed his contractual obligations, are not dispositive of the determination of the defendant's reasonable time for performance under the contract between the plaintiff and the defendant because they were not the only facts that the referee was entitled to consider in reaching his conclusion. Accordingly, the defendant's argument to the contrary notwithstanding, we conclude that the referee's finding that the defendant's reasonable time for performance had expired by June 7, 1988, was not clearly erroneous.

The defendant's final challenge to the referee's determination of liability is his claim that the plaintiff sought to establish his liability under a theory of anticipatory breach while the referee found the defendant liable under a theory of breach of an implied reasonable time for performance.[4] The defendant argues that this variance requires our reversal of the judgment. We find the defendant's claim to be without merit.

In his brief, the defendant's entire argument on this point consists of three sentences.[5] The sole authority for his claim is this court's decision in *Francis* v. *Hollauer*, 1 Conn. App. 693, 475 A.2d 326 (1984).

In *Francis* v. *Hollauer*, supra, the plaintiffs sought to enjoin the defendants from maintaining a fence in the middle of the parties' jointly used driveway and sought to quiet title to the portion of the driveway

---

[4] "An anticipatory breach of contract occurs when the breaching party repudiates his duty before the time for performance has arrived." *Pullman, Comley, Bradley & Reeves* v. *Tuck-it-away, Bridgeport, Inc.*, 28 Conn. App. 460, 465, 611 A.2d 435, cert. denied, 223 Conn. 926, 614 A.2d 825 (1992); *McKenna* v. *Woods*, 21 Conn. App. 528, 532, 574 A.2d 836 (1990).

With respect to the claim of anticipatory breach, the referee concluded that "the plaintiff's efforts to shoehorn his factual situation into the doctrine of anticipatory repudiation must fail. Where, as here, there has been no statement by the defendant of a refusal to perform, there must be, at least, an affirmative act by the defendant indicating an inability or unwillingness to perform." The referee found no such act by the defendant.

The plaintiff does not challenge this conclusion by way of an alternative ground on which the judgment may be affirmed. See Practice Book § 4013 (a) (1) (A).

[5] In his brief, the defendant's entire argument in support of this claim is as follows: "The plaintiff did not try or brief this case on a theory of breach of a reasonable time for performance of a severable agreement, but on the theory of anticipatory breach of the total contract. (Exhibits B, C, D, & V). A litigant cannot try a case on one theory and recover under another. *Francis* v. *Hollauer*, 1 Conn. App. 693, 475 A.2d 326 (1984), (Judgment granting plaintiffs a prescriptive easement reversed on basis that only adverse possession theory was alleged). It was therefore error to enter judgment on a wholly different cause of action, (breach of implied contract term) than averred by the plaintiff, (anticipatory repudiation or breach of express contract term)."

where the defendants had constructed a fence. The complaint alleged that the plaintiffs were entitled to the relief claimed based on their "actual, visible, exclusive, open and notorious adverse possession of the property for more than fifteen (15) years." The trial court rendered judgment for the plaintiffs, concluding that the plaintiffs had proved a claim of right to a prescriptive easement over the fenced off portion of the driveway. Noting that "[i]t is fundamental in our law that the right of a plaintiff to recover is limited to the allegations in his complaint" and that a "variance [between the pleadings and the proof] is material if the defendant was prejudiced in maintaining his defense, surprised by the plaintiff's proof or misled by the allegations in the complaint"; id., 695; this court reversed the judgment after concluding that the variance between the pleadings and proof was material. Specifically, this court concluded that "[t]he defendants were misled by the allegations in the complaint and prejudiced in the preparation and maintenance of their defense." Id., 697.[6]

---

[6] In arriving at this conclusion, the *Francis* court reasoned that "the judgment was based on an entirely different cause of action from any alleged in the complaint. Any claim of prescriptive easement was not within the issue presented by the pleadings and could not properly be adjudicated in this action. A claim of prescriptive easement requires proof that the claimant's use of the property has been open, visible, continuous and uninterrupted for fifteen years under a claim of right. . . . A claim of title by adverse possession requires a claimant to prove that the owners have been ousted from possession from the property in dispute for an uninterrupted period of fifteen years under a claim of right by an open, notorious and exclusive possession. . . . On the basis of the elements of the claim of adverse possession, the defendants focused their defense on the exclusion factor which distinguishes adverse possession from a prescriptive easement. During the course of the trial, evidence was introduced by the plaintiffs which tended to prove a prescriptive easement to the triangular parcel. The defendants made numerous objections on the grounds of relevancy claiming that the evidence was irrelevant to the claim of adverse possession alleged in the complaint. The plaintiffs consistently maintained that the evidence was relevant to the issue of adverse possession which was the basis of their claim to the disputed parcel." (Citations omitted.) *Francis* v. *Hollauer*, 1 Conn. App. 693, 695–96, 475 A.2d 326 (1984).

The present case differs markedly from the *Francis* case in several respects. First, we are not presented with any variance between the pleadings and the proof here. The amended complaint alleges a breach of contract, and the plaintiff recovered for a breach of contract. Significantly, the amended complaint does not allege or suggest that the defendant's breach was anticipatory, that is, that it occurred at some point before performance was due.[7] Rather, the amended complaint claims that the defendant breached the contract between the parties when he "failed to deliver a second or third draft of the book to the Publisher on or before March 30, 1988." Consequently, the issue of the defendant's time for performance under the agreement between the parties was the very issue in dispute that the referee was called on to, and did, decide. Second, because there is no requirement that a plaintiff plead the legal effect of the facts alleged in the complaint; see Practice Book §§ 108 and 109; it is permissible for a plaintiff to seek recovery under the facts alleged based on incompatible legal theories. *Burns* v. *Koellmer*, 11 Conn. App. 375, 386, 527 A.2d 1210 (1987). If two such theories of recovery are asserted in the same action, it is for the trier of fact to determine whether the plaintiff has proved both, neither, or only one of them. Id. Third, the defendant has failed to show how he was prejudiced in maintaining his defense, surprised by the plaintiff's proof or misled by the allegations in the amended complaint. While there may be significant differences between a case based on an anticipatory breach, which identifies a time of performance that has yet to expire, and one based on

[7] In fact, the plaintiff's theory of an anticipatory breach by the defendant was first offered to the attorney trial referee in the plaintiff's "proposed findings of fact, proposed findings of law and proposed judgment," which was filed with the attorney trial referee *after* the conclusion of the hearing.

the breach of an implied reasonable time for performance, which identifies a time of performance that has already expired, the defendant has not indicated to us how these differences affected the preparation or presentation of his defense. See footnote 5, supra. Under such circumstances, the alleged variance challenged by the defendant in this case does not warrant the reversal of the judgment.

## II

### DAMAGES

In his first challenge to the award of damages, the defendant argues that the court should not have awarded damages at all because the January 14, 1988 agreement between the parties provides that "[i]n the event that any of [the $30,000 advance] must be repaid to [the publisher], under the contract, the repayments will be proportional to the amount of the funds received between Burnham and Colby." The defendant contends that this provision controls the determination of damages in this case because the publisher never required any repayment of the advance moneys. The defendant argues, in his brief, that this provision permitted the plaintiff to recover money damages from the defendant "only *if required* by the publisher, something that did not happen." (Emphasis in original.) The defendant's argument to the contrary notwithstanding, the referee found that the provision "is limited only to the manner of repayment of any funds demanded by the Publisher" and did not preclude the plaintiff from availing himself of the usual contract damages remedy where "[t]he plaintiff has suffered monetary damages [due to the defendant's breach of his obligation to produce publishable material] despite the fact that [the] Publisher did not demand repayment of the advance paid over to Burnham." We conclude that these findings were not clearly erroneous.

The defendant's final challenge is to the calculation of the amount of damages. The defendant claims that because the plaintiff expected to be paid $45,000 by the publisher for the book but had agreed to pay McCargar $10,000 for his work on the book before the plaintiff began working with the defendant, meaning that the plaintiff expected to net $35,000 on the book, the proper measure of damages was the difference between $35,000 and the $17,000 that the plaintiff ultimately received, or $18,000. We conclude, however, that the court properly awarded damages in the amount of $23,000.

The defendant correctly notes that "[c]ontract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of the bargain by awarding a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed." 22 Am. Jur. 2d 68, Damages § 45 (1988); see also *Bachman* v. *Fortuna,* 145 Conn. 191, 194, 141 A.2d 477 (1958). Such damages, moreover, are to be determined as of the time of the occurrence of the breach. *O'Hara* v. *State,* 218 Conn. 628, 642, 590 A.2d 948 (1991); *West Haven Sound Development Corporation* v. *West Haven,* 207 Conn. 308, 317, 541 A.2d 858 (1988).

It is clear that, when the parties agreed with the publisher in late 1987 to produce Lost Victory and when the defendant subsequently breached the contract between the parties, the plaintiff expected to receive $45,000 for the production of the book. Under the circumstances of this case, however, the $45,000 is not a proper measure of the "position . . . [the plaintiff] would have been in had the contract been performed" because it does not take into account the effect of the plaintiff's prior agreement with McCargar. Before the plaintiff worked with the defendant, he had a coauthor relationship with McCargar. When that relationship

terminated in mid-1987, the plaintiff paid McCargar $5000 and agreed to pay him an additional $5000 if and when the book was eventually published. The plaintiff's liability for this second $5000 payment, then, was contingent on the publication of the book, and, hence, intertwined with the performance of the parties' contract. Because the plaintiff's expectation at the time he contracted with the defendant was that the performance of the parties' contract would trigger his obligation to pay McCargar the remaining $5000, the court properly deducted that $5000 from the $45,000 that the plaintiff expected to receive at the time of the completion of his contract with the defendant. The difference between that figure, $40,000, and the amount of money received by the plaintiff, $17,000, led the referee to award the plaintiff $23,000 to give him the benefit of his bargain.

The defendant argues that, in its calculation of the plaintiff's expectation interest, the referee should have also included the $5000 paid to McCargar in late 1987. In the defendant's view, this calculation more accurately reflects the amount that the plaintiff would have received from his efforts to publish the book. While this method of "accounting" may more accurately reflect the plaintiff's "profit" on his literary endeavor, it does not represent a proper method for the calculation of damages for the defendant's breach of contract. There is no evidence in the record that the first payment to McCargar played any role in the agreement reached between the parties. Moreover, at the time the plaintiff and the defendant reached their agreement to produce a book together, the plaintiff had already paid the first $5000 to McCargar. That expense, not unlike many other expenses incurred by the plaintiff in creating the manuscript that he gave to the defendant at the start of their work together, was already incurred and was part of the plaintiff's outlay

*whether or not* the plaintiff ever entered into a contract with the defendant. For these reasons, it would have been inappropriate to take that payment into account in the calculation of damages.[8] Accordingly, the defendant's challenge to the amount of damages awarded by the trial court must fail.

The judgment is affirmed.

In this opinion the other judges concurred.

[8] The defendant suggests that the $5000 previously paid by the plaintiff to McCargar should affect the calculation of damages because that amount "paid to [the plaintiff's] once and future co-author, James McCargar, was credited to Colby in the eventual division of the advance proceeds." The defendant has provided us with no authority in support of this proposition.

We conclude, however, that because the plaintiff's damages for the defendant's breach of contract must be calculated as of the time of the occurrence of the breach; *O'Hara* v. *State,* 218 Conn. 628, 642, 590 A.2d 948 (1991); the fact that the plaintiff thereafter fortuitously negotiated an agreement with McCargar that took his previous agreement with McCargar into account is "irrelevant to the amount of damages . . . ." Id.; see also *Rametta* v. *Stella,* 214 Conn. 484, 492–93, 572 A.2d 978 (1990).