## PATRICIA HARRINGTON *v.* KATHY A. DYER

Superior Court, Judicial District of Tolland
File No. CV-07-5001166-S

Memorandum filed July 27, 2007

*Jacobs, Walker, Rice & Basche, LLC*, for the plaintiff.

*Ford Oberg Manion and Houck, PC*, for the named defendant et al.

VACCHELLI, J. This case is an action to collect a debt due on a promissory note made in connection with the sale of a real estate agent's business. The plaintiff, Patricia Harrington, alleges that she sold her real estate business to the defendant, Kathy A. Dyer, that Dyer executed a promissory note in payment and that Dyer is in default on the note. Harrington has made an application for a prejudgment remedy seeking to garnish 20 percent of Dyer's net real estate commissions earned, and expected to be earned in the future, up to the total amount of $56,641.67. For the following reasons, the court denies the request to garnish commissions, but otherwise grants the application, but only up to the total amount of $26,641.67.

I

The complaint was previously served and appearances were filed on behalf of the parties. An appearance was also filed for the proposed garnishee, B/W Realty, Inc., doing business as RE/MAX East of the River. The court heard testimony on the application on June 15 and 20, 2007, from the parties, and from the witnesses, Barbara Weinberg, broker at RE/MAX East of the River, and Marilyn Vatteroni, a salesperson at RE/MAX East of the River. The parties subsequently filed briefs. The court finds as follows. Harrington was a real estate salesperson licensed in Connecticut, working for RE/MAX East of the River, when she met Dyer in 2003. At the time, Dyer was looking to purchase a house for herself. Dyer also had an interest in becoming a real

estate salesperson and learned that Harrington was planning to move out of state and sell her real estate business. After Dyer studied for, and obtained, a real estate salesperson's license, the parties began discussing the purchase and sale of Harrington's business. Those discussions led to the parties' executing the subject promissory note, and a purchase and sale agreement for the business, both dated October 2, 2004, and Dyer began working as a salesperson at RE/MAX East of the River.

The promissory note, admitted in evidence, required Dyer to pay $60,000 for the business, in installments, plus 3 percent per annum in the event of default. The purchase and sale agreement provided that the seller agreed to sell, and the buyer agreed to buy, assets and materials listed on a schedule one, and transfer would be by bill of sale. The effective date of the agreement was upon execution of the agreement, which occurred on October 2, 2004. RE/MAX East of the River also signed an addendum to the purchase and sale agreement under which it was to withhold 20 percent of Dyer's net commissions, and pay them to Harrington, in the event Dyer defaulted on the note.

Dyer paid Harrington $5000 on signing and paid another $5000 in 2005. RE/MAX East of the River is also holding another $5000 of Dyer's net commissions on the basis of Harrington's declaration of default, but it has not paid it to Harrington pending an order of this court.

The purchase and sale agreement expressly contemplated that Harrington could continue to work as a real estate salesperson, and earn commissions, "until the date Seller moves to North Carolina." Harrington filed termination papers with RE/MAX East of the River effective June 30, 2005, and continued to earn commissions until she completed her move to North Carolina, which occurred in November, 2005.

Harrington's application for a prejudgment remedy asks for a garnishment against Dyer's commissions to secure the $50,000 principal allegedly still owed on the note, plus $1641.67 interest and $5000 in attorney's fees for a total of $56,641.67. Harrington further requested the court to order RE/MAX East of the River to pay her (Harrington) 20 percent of any commissions earned by Dyer until that sum is paid in full as a prejudgment remedy.

## II

The first issue is whether the court can order that commissions be garnished and paid to Harrington *pending the outcome of the case* as requested in the application, or whether the court can only order that the assets be secured pending a final judgment. Ordinarily, in a garnishment, the court can only order that the garnishee secure the assets pending judgment. General Statutes § 52-329. To resolve the issue, Harrington orally agreed at the hearing to amend her application to ask only for an order that the garnishee secure the assets pending judgment. Dyer did not object. That amendment to the application was accepted by the court, rendering this issue moot.

## III

The second issue is whether commissions earned by a real estate salesperson can be garnished *at all*. General Statutes § 52-329 provides in relevant part: "[W]hen a debt *other than earnings*, as defined in subdivision (5) of section 52-350a, is due from any person to such defendant . . . the plaintiff may insert in his writ . . . a direction to the officer to leave a true and attested copy thereof and of the accompanying complaint . . . with such . . . debtor of the defendant . . . and any debt due from any such garnishee to the defendant . . . not exempt from execution, shall be secured in the

hands of such garnishee to pay such judgment as the plaintiff may recover. . . ." (Emphasis added.)

Under this section, earnings are not subject to garnishment. The definition of earnings, borrowed from General Statutes § 52-350a (5), includes commissions: " 'Earnings' " means any debt accruing by reason of personal services, including any compensation payable by an employer to an employee for such personal services, whether denominated as wages, salary, *commission*, bonus or otherwise." (Emphasis added.)

Whether the commissions of a real estate salesperson are "earnings" exempt from garnishment appears to be an unsettled issue. In *William M. Raveis & Associates, Inc.* v. *Kimball*, 186 Conn. 329, 441 A.2d 200 (1982), our Supreme Court allowed a garnishment of real estate commissions without deciding a similar eligibility issue: whether they were "due and owing," as required by the statute. The court specifically declined to resolve that issue then, because "[a] hearing on a prejudgment remedy application under [General Statutes] § 52-278d is not the occasion to test the plaintiff's rights against the garnishees. The order by the trial court garnisheed whatever debts were due the defendants from the garnishees as of the date of the garnishment. . . . The extent of that seizure, the determination of what debts, if any, were then owed to the defendants, must await either a scire facias hearing under General Statutes § 52-381 . . . or a declaratory judgment under General Statutes § 52-235a. . . . The hearing authorized by § 52-278d is expressly limited to a determination of whether or not there is probable cause to sustain the validity of the plaintiff's claim. The claim to which the section refers is the plaintiff's claim against the defendants, not the plaintiff's claim against the garnishees. Any other interpretation of the section would be inconsistent with the Prejudgment Remedies Act's repeated insistence upon expeditious resolution of contested

prejudgment remedy orders." (Citations omitted; internal quotation marks omitted.) *William M. Raveis & Associates, Inc.* v. *Kimball*, supra, 334–36.

*William M. Raveis & Associates, Inc.*, was decided before the legislature carved out the exception for "earnings" from the garnishment statute. See Public Acts 1990, No. 90-149. After the 1990 change, on an appeal from a prejudgment remedy ruling, our Supreme Court did take up and resolve, on the merits, the issue of whether a right to accumulated sick leave payments were "earnings" exempt from garnishment. See *Board of Education* v. *Booth*, 232 Conn. 216, 654 A.2d 717 (1995). That action by the court in the *Booth* case teaches that it is appropriate for the Superior Court, during a prejudgment remedy proceeding, to resolve issues of whether assets are earnings exempt from garnishment. It also teaches that "[w]hether a payment obligation constitutes 'earnings' exempt from prejudgment garnishment is a determination to be made on a case-by-case basis." Id., 221 n.11. Therefore, this court will undertake to resolve the issue on the merits.

In determining the meaning of statutes, first we look at the text. "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." General Statutes § 1-2z. In this case, there is no need to look further.

The prejudgment remedy statutes, as well as the garnishment statute, prohibit the garnishment of "earnings" as defined in subsection (5) of § 52-350a. General Statutes § 52-278b (2). Postjudgment remedies apply

instead. General Statutes, ch. 906. The borrowed definition broadly encompasses "any debt accruing by reason of personal services . . . ." General Statutes § 52-350a (5). It also includes "any compensation *payable by an employer to an employee* for such personal services, whether denominated as wages, salary, *commission*, bonus or otherwise." (Emphasis added.) General Statutes § 52-350a (5). Although that second phrase specifically involves commissions, that phrase apparently applies only to commissions earned in the employer-employee relationship, as the emphasized portion demonstrates. That provision is not applicable in this case because the testimony showed that Dyer is not an employee. Dyer is a licensed real estate salesperson. She is permitted to engage in the real estate business, but only if she is affiliated with a broker. A broker lists and sells the real estate for the property owner. General Statutes § 20-311 (1). A salesperson lists and sells the real estate on behalf of the broker. General Statutes § 20-311 (2). A salesperson may be either an employee or an independent contractor affiliated with a broker. General Statutes § 20-311 (2). A salesperson must keep the real estate commission updated on her employment or affiliation status. General Statutes § 20-319a. The testimony in this case showed that salespersons affiliated with RE/MAX East of the River were independent contractors. Dyer was affiliated with RE/MAX East of the River. Thus, the court finds that she is an independent contractor. Therefore, the second phrase of the definition of "earnings" does not apply to the facts in this case.

Nevertheless, the first phrase more broadly encompasses "any debt accruing by reason of personal services . . . ." General Statutes § 52-350a (5). Dyer is certainly engaging in a personal service when she is listing and selling homes for a broker as a real estate salesperson. She also performs a variety of professional functions on behalf of the seller or buyer, as well:

" '[e]ngaging in the real estate business' means acting for another and for a fee, commission or other valuable consideration in the listing for sale, selling, exchanging, buying or renting, or offering or attempting to negotiate a sale, exchange, purchase or rental of, an estate or interest in real estate or a resale of a mobile manufactured home, as defined in subdivision (1) of section 21-64, or collecting upon a loan secured or to be secured by a mortgage or other encumbrance upon or transfer of real estate . . . ." General Statutes § 20-311 (3).

In further satisfaction of this provision, her commissions are a debt accruing by reason of that personal service. The testimony in this case showed that salespersons for RE/MAX East of the River earned payments at closings of listed real estate, payable through the broker. Dyer is a salesperson at RE/MAX East of the River. Her commissions are debts accruing by reason of her personal service.

Accordingly, the court finds that her commissions are earnings exempt from garnishment in a prejudgment remedy application. Accord *Caliendo* v. *Coassin*, Superior Court, judicial district of Fairfield, Docket No. CV-94-0314356 (October 28, 1994) (*Levin, J.*) (12 Conn. L. Rptr. 599) (lawyer's partnership draw constitutes "earning" exempt from garnishment prejudgment remedy).

Harrington asks the court to grant the garnishment of commissions requested, notwithstanding the statutory ban, because the parties, by contract, agreed that a portion of Dyer's commissions would be paid to Harrington in cases of default. Indeed, the contract addendum, signed by the proposed garnishee, does address that point, and the prejudgment remedy application matches that agreement. However, this case is not before the court for a judgment or temporary order for specific performance of the addendum. It is before the

court for a ruling on the application for a prejudgment remedy only, and there is no agreement by the parties to convert the nature of the proceedings. The prejudgment remedy statutes and garnishment statute ban garnishment of Dyer's commission. The application, therefore, is denied with regard to Dyer's commissions.

Nevertheless, and to the extent Dyer has other nonexempt, eligible assets that can be subject to a prejudgment remedy, the application remains viable subject to the resolution of the remaining issues.

## IV

The third issue is whether the prejudgment remedy application should be granted as to any other assets, if any. Under § 52-278d (a), the court must make four determinations: (1) whether there is probable cause that judgment will be rendered in favor of Harrington in an amount equal to or greater than the amount of the prejudgment remedy requested, taking into account all defenses, counterclaims or setoffs; (2) whether Dyer has adequate insurance to pay any judgment that may be rendered; (3) whether the property is exempt from execution; and (4) whether to require a bond.

## A

The parties presented considerable evidence at the hearing on some of these issues. However, the prejudgment remedy probable cause review is extremely limited. "It is firmly established that the trial court's hearing in probable cause is not intended to be a full scale trial on the merits of the plaintiff's claim. The plaintiff does not have to establish that he will prevail, only that there is probable cause to sustain the validity of the claim. . . . The court's role in such a hearing is to determine probable success by weighing probabilities." (Internal quotation marks omitted.) *Fischel* v. *TKPK, Ltd.*, 34 Conn. App. 22, 24, 640 A.2d 125 (1994).

B

With those principles in mind, the court finds that there is probable cause to believe that it will be found as follows: Dyer executed the promissory note on October 2, 2004. She has paid only $10,000 on her total obligation so far, and, in an e-mail to Harrington dated February 16, 2006, made it clear she was not going to pay anything further. Dyer has defaulted on her obligations under the note. Harrington thereafter properly considered Dyer in breach of the note and properly called it due in full.

Dyer argues that she should not be deemed in default because certain commissions earned by Harrington should have been applied against her debt and, if they had been so applied, she would not have been in default. However, the court finds, in part IV E, that it will probably be found that the contested commissions were not available to Dyer. Therefore, it is not probable that Dyer will prevail on this defense.

C

Dyer also argues that the promissory note should not be enforced because Harrington committed fraud in purporting to sell the business. This point is raised as a special defense in her answer to the complaint. In order to establish the special defense of fraud, Dyer must prove that (1) a false representation was made by the plaintiff as a statement of fact, (2) the statement was untrue and known to be so by the plaintiff, (3) the statement was made with intent of inducing reliance thereon and (4) the defendant relied on the statement to her detriment. See *Nazami* v. *Patrons Mutual Ins. Co.*, 280 Conn. 619, 628, 910 A.2d 209 (2006).

The argument centers on the fact that real estate agents do not operate autonomous businesses. Ordinarily, they must have a license. General Statutes §§ 20-312 (a), 20-325. Licenses are not transferable, i.e., they

are personal and are issued only to the applicant approved by the real estate commission. General Statutes § 20-314 (a). Moreover, as discussed, the commission issues licenses to brokers and salespersons. A broker lists and sells the real estate for the property owner. General Statutes § 20-311 (1). A salesperson must be affiliated with a broker as an independent contractor or employee, and that salesperson lists and sells the real estate on behalf of the broker. General Statutes § 20-311 (2). Thus, Dyer suggested at the prejudgment remedy hearing that Harrington had nothing to sell. The court does not find probable cause that Dyer will prevail on this point. It is probable that Harrington can prove that she did have, inter alia, knowledge, a client contact list and good will to sell. In fact, the parties wrote a list of items to be sold as part of the purchase and sale agreement, listed in schedule one of that agreement, and it is probable that Harrington can prove that she had an interest in all those items and that they could be, and in fact were, sold.

D

Next, Dyer argues that the contract should not be enforced because it should be found void due to mutual mistake. The factual predicate necessary for a finding of mutual mistake is that both parties relied on the same mistaken information in entering into a contract. *BRJM, LLC* v. *Output Systems, Inc.*, 100 Conn. App. 143, 150, 917 A.2d 605, cert. denied, 282 Conn. 917, 925 A.2d 1099 (2007). A mutual mistake requires a mutual misunderstanding between the parties as to a *material* fact. See *Dainty Rubbish Service, Inc.* v. *Beacon Hill Assn., Inc.*, 32 Conn. App. 530, 537, 630 A.2d 115 (1993). Dyer asserts that the mutual mistake in this case is that both parties expected Harrington to move to North Carolina and discontinue her operation of her real estate business by January, 2005. Harrington did not move until November, 2005. The court does not believe

that it is probable that Dyer will prevail on this defense. The agreement, signed in October, 2004, did contemplate a transition period that permitted Harrington to continue operating her business and earn commissions "until the seller moves to North Carolina." However, there is no deadline or expectation expressed in the document as to when Harrington would move, nor was an alternate deadline imposed. If the deadline was material, it easily could have been, but was not, included in the contract. On the basis of the testimony heard at the hearing, the fact that Harrington moved ten months after Dyer expected her to move will probably be found to be not material to the issues in this case. Unexpected, but normal, delays were encountered, and there was no objection from Dyer. Moreover, "[w]here no time for the performance of a contract is contained within its terms, the law presumes that it is to be performed within a reasonable time." (Internal quotation marks omitted.) *Colby* v. *Burnham*, 31 Conn. App. 707, 715, 627 A.2d 457 (1993). Ten months is not an unreasonable amount of time to transition out of a business and move out of state under the circumstances described in the testimony in this case.

E

Whether Harrington completed the sale and performed her obligations under the purchase and sale agreement is another issue. Dyer claims that Harrington did not give Dyer the items or information described in the purchase and sale agreement, causing Dyer damage and loss of income. The points are discussed seriatim.

Dyer claims that any commissions earned by Harrington after June 30, 2005, the effective date of her resignation from RE/MAX East of the River, should have been counted as payments by Dyer against the promissory note debt. She complains that Harrington continued to earn more than $50,000 in commissions until Harrington

finally moved to North Carolina at the end of 2005. In fact, if those commissions had been properly credited, her debt would be paid by now and Harrington would owe Dyer money, she argues. On the other side, Harrington argues that the agreement permitted her to continue earning commissions until she moved to North Carolina, which occurred in November, 2005. The court finds that it is probable that Harrington will prevail on this point. The agreement provided: "Seller shall have the right to use in any manner those items purchased to Buyer and described in Schedule 1 hereof for the purpose of seller soliciting and obtaining customers for real estate transactions until the Seller has moved." Also, "Seller will be entitled to one hundred percent (100%) of all commissions on real estate transactions to which she is entitled as a real estate agent on contracts negotiated by her whether such commissions are payable prior to or after her moving . . . ." Expressly excluded from the sales agreement were "closed commissions or deposits on any transactions initiated by Seller from the date hereof (October 4, 2004) until Seller moves to North Carolina." Also, commissions from current listings were to be applied to pay down Dyer's debt only "after Seller moves." Thus, Dyer was eligible for credit for Harrington's commissions only after Harrington moved. It is probable that Dyer will not prevail on this point.

Next Dyer claims that Harrington failed to give her a bill of sale, as required by § 4 of the purchase and sale agreement, which provides: "INSTRUMENT OF TRANSFER. Transfer will be by Bill of Sale with full warranties." Harrington admits that she did not give Dyer a bill of sale. Nevertheless, the agreement was "effective upon execution of this agreement." It is probable that this deficiency will be found to be insignificant and to have caused no harm.

Finally, Dyer also claims that Harrington failed to perform all of her duties required under schedule one of the agreement, which lists the assets and effects to be sold. The list is as follows:

"SCHEDULE 1

"1. Database listing of all clients/prospects, (approximately 300) which include names, addresses, phone numbers and emails of these clients that Seller has.

"2. All past/present clients and future prospect files will be turned over to Buyer including Comparative Market Analysis of future listings.

"3. Labels of all past/present clients and future prospects in business prospecting areas with one set of hard labels, signs and riders.

"4. Joint advertising in newspapers and direct mailings to clients to commence upon signing of this agreement.

"5. Work together to electronically export text files to Buyers computer of clients/prospects from current label database program; including forms, labels, latter being used by the Seller.

"6. One-on-one direct mentoring, consulting and training to ensure seamless servicing of clients to commence as of the signing of this agreement until Seller moves then will be remote mentoring for another 6 month period. Seller Real Estate license will be renewed in 2005.

"7. As requested by Buyer, Seller will extend personal phone contact with potential prospects from existing database of clients/prospects to assist in solidifying relationship continuance between the Business customer base and the Buyer.

"8. Personal introductions through open house type event for Buyer to meet clients/prospects who are forecasted to buy/sell in the next 18 months but after Seller moves and any current power team members, i.e.: business real estate attorneys, mortgage professionals, tradesmen, home inspectors, etc.

"9. Seller produce copies of 2001, 2002 and 2003 Re/Max East of the River 1099 forms for review by the Buyer and quantify the transaction types to match the income level on each 1099.

"10. Upon Seller's move date (or as decided by the seller, whichever is earlier) the following will be transferred to the Buyer if possible:

"a. Current home office telephone number (860) 872-2353

"b. Connecticut automobile license plate IMSOLD when N.C. registration becomes effective."

The parties provided much testimony on each point, and their opinions and observations were starkly different, each blaming the other for failures and shortcomings and each holding the other responsible for those failures and shortcomings. The court finds it probable that Harrington will prove that she made an effort to accomplish each item but met obstacles put up by Dyer. It is also probable that Dyer will be able to prove that Harrington's performance was deficient in part, causing her to need to get help elsewhere to accomplish the parties' mutual expectation that Dyer was paying to take over Harrington's ongoing real estate business. Although there was no guarantee that the sale of the business would produce results for Dyer, the court finds that Dyer earned only one commission from any of Harrington's contact list and efforts to transition the business to Dyer, proof that the deficiencies in the transition effort caused financial harm.

In sum, the court finds it probable that judgment will be rendered in Harrington's favor on the note in this case, but it is also probable that Dyer will prevail on some of the points in her counterclaim that Harrington caused her damage in the deficient way she performed her obligations under schedule one of the agreement. The court finds probable cause to believe that Harrington will prevail in obtaining damages in the amount of $50,000 principal still owed on the note, plus $1641.67 interest and $5000 in costs and attorney's fees, as requested in the prejudgment remedy application. On her counterclaim for breach of contract, "[c]ontract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of the bargain by awarding a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed. . . . Such damages, moreover, are to be determined as of the time of the occurrence of the breach." (Citations omitted; internal quotation marks omitted.) *Colby* v. *Burnham*, supra, 31 Conn. App. 721. Under this standard, it is probable that Dyer sustained damage by Harrington's deficient performance by $30,000. Accordingly, the court grants Harrington's application, but only up to the amount of $26,641.67.

The court finds no evidence of insurance to pay any judgment that may be rendered; it finds no evidence that other property is exempt from execution, and it finds no need to require a bond.

V

For all of the foregoing reasons, the court denies the application for a prejudgment remedy to garnish real estate salesperson commissions of Dyer but allows a prejudgment remedy with respect to any other eligible, nonexempt assets of Dyer to the total value of $26,641.67 only.