## DECARLO AND DOLL, INC. *v.* TERRY M. DILOZIR
### (AC 15568)

Lavery, Heiman and Hennessy, Js.

Submitted on briefs March 24—officially released July 8, 1997

*Dominic J. Caciopoli* filed a brief for the appellant (plaintiff).

*Homer G. Scoville* filed a brief for the appellee (defendant).

*Opinion*

LAVERY, J. The plaintiff, DeCarlo and Doll, Inc., appeals from the judgment of the trial court for the defendant, Terry M. Dilozir, in a breach of a contract action. On appeal, the plaintiff contends that the trial court improperly found the contract ambiguous and therefore determined that a subsequent letter between the parties was a contractual amendment. This determination by the trial court permitted the defendant to prevail on a special defense that alleged that the defendant's payment obligations under the contract were conditioned on the defendant's securing financing from a third party, which never occurred. We agree with the plaintiff and reverse the judgment of the trial court.

The following facts are relevant to this appeal. On July 10, 1989, the defendant signed and accepted a proposal submitted by the plaintiff dated June 16, 1989. The first sentence of the proposal stated: "We are pleased to submit this proposal for engineering and technical services required to prepare a site plan and applications for development of proposed self storage and business services at the Nutec Property on Route 85 in Amston." The proposal consisted of four parts.

Part one of the proposal was entitled "basic scope of services" and had ten separate subparts.[1] These ten subparts listed the services that the plaintiff would perform for the defendant, including the preparation of various plans and reports concerning the development of the defendant's facility. Part two of the proposal listed "additional services" that were not included in

---

[1] Part one of the proposal stated in its entirety: "1. We will prepare a Class A-2 survey and related title search to indicate property lines, deed lines, lines of occupation, easements and encroachments affecting the use of the property. We understand you intend to recombine the parcels into one larger 14+ acre parcel. 2. We will retain a certified soil scientist to field locate limits of wetlands and identify soil types. This subcontractor will invoice you directly. 3. We will prepare a topographic map of the site at 40 scale with 2' contour interval. We will also indicate limits of wetlands. 4. With the concurrence of the Town Sanitarian, we will review existing as built septic system information and conduct soil test program to evaluate the capacity of the existing septic system. We will require the use of a back hoe and operator, who will act as a subcontractor and invoice you directly. 5. We will coordinate with State D.O.T. and the Hebron Town Planner to review preliminary layouts for egress to Route 85. 6. We will evaluate physical conditions of the existing buildings and make recommendations for rehabilitation and/or demolition. We will coordinate with representatives of self storage units supplier for optimum size/quantity distribution. 7. We will prepare a final site plan to indicate buildings, grading, parking areas, drainage, utilities, lighting, landscaping, and sediment and erosion control. 8. We will prepare 'preliminary' architectural plans to show floor areas for parking calculations, and typical building elevations including facade improvements for planning purposes. 9. We will prepare storm drainage computations, engineers cost estimate for bonding of public improvements, Inland Wetland Applications and Site Plan Review Applications. 10. Preparation and submission of plans and applications to and attendance of Inland Wetland Commission and Planning and Zoning Commission meetings and public hearings."

the plaintiff's basic scope of services, but could be provided by the plaintiff if the defendant desired. Part three of the proposal was entitled "Fees, Schedules, and Payment" and had seven parts[2] that addressed the payment structure of the transaction. The fourth and final part of the proposal was entitled "Contract/Notice to Proceed" and stated: "We are looking forward to the opportunity of being of service to you on this project. If this proposal meets your approval, kindly sign and return one copy to this office with the $3,000 retainer. This will serve as our notice to proceed and contract."

In addition to the aforementioned proposal, the parties executed an "amendment" to their initial agreement, which was signed by the plaintiff on July 6, 1989, and by the defendant on July 10, 1989. Part one of this amendment stated that "[t]his amendment is to be attached to, made a part of and incorporated by reference into the above noted agreement between [the parties]. . . . The fees, schedules, and payments in section III of the agreement are amended to or supplemented as indicated below."

Part two of the amendment entitled "Fees, Schedules, and Payments" stated: "A) Item 4 of the Original Contract 'Retainer' will be reduced from a retainer of $3,000 to a retainer of $2,000. B) Item 5 'payment schedule'

---

[2] Part three of the proposal states in pertinent part: "1. All work described in Section I, Basic Scope of Services, Design Services—Items 1–9, will be completed for the Lump Sum Fee of $24,000 excluding subcontractor such as soil scientist and backhoe and operator who will invoice you directly for those services. 2. All work described in Section I , Basic Scope of Services, Attendance at meetings—Item 10, will be completed on a Per Diem Basis according to our current Hourly Rate Schedule. We suggest a budget of $2,000 for this work, however this budget may change as the scope is defined. 3. Additional Services as outlined under Section II, may be completed on a lump sum or per diem basis depending upon whether scope of work can be defined. Fees and budgets will be negotiated at the time such services are requested. 4. A retainer of $3,000 will be required prior to commencement of work. This retainer will be held and applied to your final invoice. . . ."

shall be revised to be 6 monthly payments and the interest accrued for carrying charges. Interest will be as stated in the original contract of 1% on amounts over 30 days. The 6 monthly payments will be $3666.67 each month starting with the July invoices. The 6th invoice will also show the retainer being applied bringing the total to $24,000 not including interest. You will be invoiced separately for meetings which are on a per diem basis in accordance with the original contract. . . ." Part three of the amendment stated: "This agreement does not alter or modify terms and conditions of any other agreements between [the parties]."

Following the execution of the original agreement and its accompanying amendment, the plaintiff sent a letter dated February 8, 1990, to the defendant. This letter stated: "In our proposal dated June 16, 1989, we suggested a budget of $2,000 for the application preparation and meeting attendance (basic scope of services, item 10). Meetings with the abutters to your project and design changes due to Town Staff and DOT comments were not included in this budget. Because of this increase in scope, we suggest the budget for this item be increased to $8,000. Kindly sign and return one copy to this office."

The defendant added a handwritten sentence to the lower portion to the letter. This sentence stated: "Subject to payment with all outstanding payments to be paid in full at time of financing of project" and was initialed by both the plaintiff and the defendant. The defendant signed and dated this letter on August 2, 1990.

The plaintiff performed the services mentioned in the proposal and billed the defendant for the amount of $25,411.38. The defendant never received financing and did not pay $22,926.40 from the bill for the plaintiff's services. The plaintiff brought a breach of contract

action against the defendant, and the defendant filed a counterclaim and special defenses.[3]

After a trial, the trial court ruled that the second sentence of section three, part two, of the contract is ambiguous. That sentence states: "We suggest a budget of $2,000 for this work, however this budget may change as the scope is defined." The trial court held: "I find that there was an ambiguity in the initial contract, about whether the $2,000 was an estimate or a maximum cap, and when the plaintiff sent the defendant [the letter from February 8, 1990] asking that the defendant agree to an increase in the budget for item 10 in [the original contract], from $2,000 to $8,000, that is a very strong indication, from which I draw the inference, that the intent of the parties was that the $2,000 would be a cap and not merely an estimate. And therefore, the increase in that cap from $2,000 to $8,000 constituted a consideration flowing from the defendant to the plaintiff . . . which supported the newly negotiated provision that's written in by hand. . . . Whatever money became due after the execution of [the letter from February 8, 1990], and whatever money was due at the time of execution of [the letter from February 8, 1990], would all be contingent."

Accordingly, the trial court found for the plaintiff on his third special defense. The defendant, in his third special defense, contended that his payments to the plaintiff were conditioned on his obtaining financing, which was an event that never occurred.

"Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . In such a situation our scope of review

---

[3] The defendant did not prevail on his counterclaim at trial.

is plenary, and is not limited by the clearly erroneous standard. . . . When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract . . . . In addition, [t]he circumstances surrounding the making of the contract, the purposes which the parties sought to accomplish and their motives cannot prove an intent contrary to the plain meaning of the language used. . . . Finally, [t]he court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity." (Citations omitted; internal quotation marks omitted.) *Venture Partners, Ltd.* v. *Synapse Technologies, Inc.,* 42 Conn. App. 109, 113–14, 679 A.2d 372 (1996). Therefore, its proper interpretation is a matter of law.

In the present case, the proposal dated June 16, 1989, sets forth the scope of the contracts. In this original contract, the plaintiff's basic scope of services in section one, parts one through nine, are to be paid pursuant to section three, part one, under fees, schedules, and payment. In return for the plaintiff's providing the services described in section one, parts one through nine, the defendant was to pay the plaintiff the fixed sum of $24,000. This figure and the scope of services in section one, parts one through nine, was not amended by any of the succeeding contract amendments between the parties. Moreover, there was no question of the plaintiff's performance of sections one through nine.

Part ten, under section one's basic scope of services, was to be paid pursuant to section three, part two, under fees, schedules, and payment. The rate used for these services is per diem according to the plaintiff's current hourly rate schedule. The $2000 budget is suggested but was permitted to change as the scope of the project was defined. This rate was never changed from the per diem rate based on the plaintiff's hourly rate. The contract also stated that payment was due thirty days after the defendant was billed on the first invoice.

The amendment to the first proposal, which was also dated on June 16, 1989, and executed by both parties, modified the payment schedule and reduced the retainer to $2000. That amendment expressly states that all other items of the contract are to remain in full effect.

The letter from the defendant to the plaintiff dated February 8, 1990, described the change in services pursuant to section one, part ten, of the basic scope of services. This agreement, which was executed by both parties, also increased the budget for this service from $2000 to $8000. In addition, payment was to be paid in full at the time of financing the project. This letter clarified and increased the scope of services in section one, part ten, of the basic scope of services, and was accepted by both parties.

We conclude that there was no ambiguity in the second sentence of section three, part two, of the contract. This sentence merely suggested a budget of $2000 for the work performed under part ten of the basic scope of services. This sentence also stated that the scope of this work could be changed as the work progressed. The letter of February 8, 1990, agreed to by both the plaintiff and defendant, did make such a change.

"In interpreting contract items, we have repeatedly stated that the intent of the parties is to be ascertained by a fair and reasonable construction of the written words and that the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms." (Internal quotation marks omitted.) *Legg* v. *Legg*, 44 Conn. App. 303, 306, 688 A.2d 1354 (1997). We conclude that the $2000 mentioned in that section of the contract was clearly a budget estimate for that section, which could later be changed as

the scope of the project developed, and not a ceiling. Therefore, this increase in the scope of services and in the budget was new consideration for the amendment set forth in the same instrument and which allowed all outstanding payments to be made at the time the defendant received financing for the project.

Furthermore, the clause "subject to payment with all outstanding payments to be paid in full at time of financing" was not a condition on which payment was contingent. This clause set forth the time, which was in the sole control of the defendant, when payment was to be made by the defendant. In *Dills* v. *Enfield*, 210 Conn. 705, 719–20, 557 A.2d 517 (1989), our Supreme Court held that a developer's duty to provide construction plans to a vendor was not discharged because the developer was unable to obtain mortgage financing. The court concluded that the developer's failure to obtain financing was an event that the parties foresaw at the time the contract was entered.[4] Id. "[O]nly in the most exceptional circumstances have courts concluded that a duty is discharged because additional financial burdens make performance less practical than initially contemplated. See, e.g., *Neal-Cooper Grain Co.* v. *Texas*

---

[4] The clause "subject to payment with all outstanding payments to be paid in full at time of financing" can be compared with a "pay when paid" clause used by contractors in the construction industry. These clauses, which appear in construction subcontracts, generally state that the subcontractor is to be paid after the contractor receives its payment. See *Blakeslee Arpaia Chapman, Inc.* v. *EI Constructors, Inc.*, 239 Conn. 708, 718, 682 A.2d 506 (1997). The Massachusetts Supreme Court has held that a "pay when paid" clause stating that "payment [to the subcontractor] will be made on monthly requisitions for progress payments 'within 10 days after [the owners'] payment of such monthly progress payments . . . [has] been received by' [the general contractor]" was "merely a setting of a time of payment and not as creating a condition precedent to payment." *A. J. Wolfe Co.* v. *Baltimore Contractors, Inc.*, 355 Mass. 361, 365, 244 N.E.2d 717 (1969). That court went on to hold that the aforementioned clause merely sets the time for payment, and "should be viewed only as postponing payment by the general contractor for a reasonable time. . . ." Id., 365–66.

*Gulf Sulphur Co.*, 508 F.2d 283, 294 (7th Cir. 1974) (party not allowed 'to escape a bad bargain merely because it is burdensome'); *American Trading & Production Corporation* v. *Shell International Marine, Ltd.*, 453 F.2d 939, 942 (2d Cir. 1972) (closing of Suez Canal requiring charterer to sail nearly twice as many miles at a cost of nearly one third more than the contract price does not excuse performance); *United States* v. *Wegematic Corporation*, 360 F.2d 674, 676–77 (2d Cir. 1966) (duty of manufacturer to produce revolutionary computer system not excused because of 'engineering difficulties' requiring two years and $1.5 million to correct); *Peerless Casualty Co.* v. *Weymouth Gardens*, 215 F.2d 362, 364 (1st Cir. 1954) (increased costs caused by the unexpected outbreak of war does not constitute superior force ending obligation of contract); *Matter of Westinghouse Electric Corporation*, 517 F. Sup. 440, 452–53 (E.D. Va. 1981) (duty to remove spent fuel not excused merely because reprocessing of the fuel became unprofitable); see also Connecticut General Statutes Annotated § 42a-2-614, comment 4; E. Farnsworth, [Contracts (1982) § 9.6], p. 680; 6 A. Corbin, Contracts (1962) § 1333; 16 S. Williston, Contracts (3d Ed. Jaeger 1978) § 1968; J. White & R. Summers, Uniform Commercial Code (2d Ed. 1980) § 3-9, pp. 131–32." *Dills* v. *Enfield*, supra, 717–18.

In addition, this obligation was in the control of the defendant, and, therefore, he will not be excused by his nonperformance. "Where a debt has arisen, liability will not be excused because, without fault of the creditor and due to happenings beyond his control, the time for payment, as fixed by the contract, can never arrive. Restatement, Contracts, § 301; Williston, Contracts, § 799; *Goldfarb* v. *Cohen*, 92 Conn. 277, 102 A. 649 [1917]." *Richard* v. *Falleti*, 13 N.J. Super. 534, 536, 81 A.2d 17 (1951). The present case, "like virtually every case involving discharge from an obligation to perform,

concerns the issue of which party bears the loss resulting from an event that renders performance by one party uneconomical. See R. Posner, Economic Analysis of Law (3d Ed. 1986) pp. 93–94; R. Posner & A. Rosenfield, 'Impossibility and Related Doctrines in Contract Law: An Economic Analysis,' 6 J. Legal Stud. 83, 86–87 (1977). 'Determining whether the non-occurrence of a particular event was or was not a basic assumption involves a judgment as to which party assumed the risk of its occurrence . . . . In making such determinations, a court will look at all circumstances, including the terms of the contract.' 2 Restatement (Second), Contracts, c. 11, introductory note. 'Since impossibility and related doctrines are devices for shifting risk in accordance with the parties' presumed intentions, which are to minimize the costs of contract performance, one of which is the disutility created by risk, they have no place when the contract explicitly assigns a particular risk to one party or the other.' *Northern Indiana Public Service Co.* v. *Carbon County Coal Co.*, 799 F.2d 265, 278 (7th Cir. 1986); see also *Wasserman Theatrical Enterprise, Inc.* v. *Harris*, 137 Conn. 371, 374–75, 77 A.2d 329 (1950)." *Dills* v. *Enfield*, supra, 210 Conn. 720. Viewing the contract as a whole, we conclude that the clause "subject to payment with all outstanding payments to be paid in full at time of financing" is not a condition precedent but a date of payment set by the defendant.

Because financing was never obtained by the defendant, the time of payment should have been within a reasonable time. When the terms of a contract's time of performance are indefinite, Corbin states: "The result generally reached is that the time is neither unlimited nor discretionary. Acceptance must be within a 'reasonable time' and the promised performance must be rendered within a 'reasonable time.' " 1 A. Corbin, Contracts (Rev. Ed. 1993) § 4.2, p. 549. In addition, we

also look to the Uniform Commercial Code (UCC) by analogy concerning a date of payment issue. We look to General Statutes § 42a-2-309 (1), which provides: "The time for shipment or delivery or any other action under a contract if not provided in this article or agreed upon shall be a reasonable time." This section of the UCC by analogy supports the contention that when an act is in the control of an obligor, and the obligor fails to act, payment should take place within a reasonable time.

Therefore, we conclude that the contract and its amendments are not ambiguous and the presence of the clause "subject to payment with all outstanding payments to be paid in full at time of financing" was not a condition that excused the defendant from performance, but was the agreed upon time of payment. Further, since this event never occurred, payment should have been made by the defendant within a reasonable time.

The judgment is reversed and the case is remanded for a new trial.

In this opinion HENNESSY, J., concurred.

HEIMAN, J., dissenting. The majority concludes that the contract and its amendments are not ambiguous, and the clause at issue was not a condition precedent, but rather an agreed upon time of payment. Thus, the majority concludes that payment should have been made by the defendant at a reasonable time. Accordingly, it reverses the judgment of the trial court and remands the case for a new trial. I believe that the result reached by the majority is incorrect, and, thus, I dissent.

In reaching its decision, the majority first concludes that the contract and its amendments are unambiguous, and thus the determination of what the parties intended by their contractual commitments is a question of law and subject to plenary review. The majority proceeds

to substitute its interpretation of the contract and its amendments for the trial court's interpretation, concluding that the handwritten clause at issue is not a condition precedent, but rather an agreed upon time of payment. I disagree.

Certain facts must be recited in order to make the issue clear. On July 10, 1989, the defendant signed and accepted a proposal submitted by the plaintiff "for engineering and technical services required to prepare a site plan and applications for development of proposed self storage and business services at the Nutec Property on Route 85 in Amston." The parties executed an amendment to their initial agreement, that was signed by the plaintiff on July 6, 1989, and by the defendant on July 10, 1989.

Following the execution of the original agreement and its accompanying amendment, the plaintiff sent a letter to the defendant, dated February 8, 1990. That letter stated: "In our proposal dated June 16, 1989, we suggested a budget of $2,000 for the application preparation and meeting attendance . . . . Meetings with the abutters to your project and design changes due to Town Staff and DOT comments were not included in this budget. Because of this increase in scope, we suggest the budget for this item be increased to $8,000. Kindly sign and return one copy to this office."

The defendant added a handwritten clause to the lower portion of the letter. That clause stated: "Subject to payment with all outstanding payments to be paid in full at time of financing of project." The handwritten clause was initialed by both the plaintiff and the defendant. The defendant signed and dated this letter on August 2, 1990.

In a trial to the court, the plaintiff's head engineer, the defendant, and James Malloy, the real estate broker who sold the property at issue to the defendant, offered

the following testimony. The plaintiff's head engineer, Michael Turner, had initially assured the defendant that, while there were no guarantees, his firm had much experience with the local zoning and planning commissions and he thought that there should be no problem in getting the construction project approved. Turner specifically told the defendant that he need not hire an attorney to get the project approved because Turner's firm had plenty of expertise in this area.

Subsequent to the mailing of the February 8, 1990 letter, the parties met on August 2, 1990. At this meeting, Turner explained that getting the project approved was costing the plaintiff much more time, energy and money than it originally anticipated, and thus it required $8000 for this portion of its services, rather than the original $2000. The defendant became upset and explained that his financing for the project by Glastonbury Bank and Trust was contingent upon the plaintiff's getting the project finally approved by the necessary commissions. Both the defendant and Malloy testified that the defendant then communicated to Turner that he would pay the plaintiff the outstanding payments under the contract only if and when the financing was approved. Turner testified that he understood the defendant's statements to be an assurance that the defendant would pay the plaintiff as soon as he obtained financing. The defendant then added the handwritten provision to the bottom of the letter dated February 8, 1990, and both parties initialed it. At the conclusion of the trial, the trial court found for the defendant on his third special defense and rendered judgment in favor of the defendant on the complaint.

I believe that the handwritten clause found on the lower portion of the February 8, 1990 letter is neither crystal clear nor unambiguous. " 'Absent a statutory warranty or definitive contract language, the trial court's interpretation of a contract, being a determina-

tion of the parties' intent, is a question of fact that is subject to reversal on appeal only if it is clearly erroneous.'" *24 Leggett Street Ltd. Partnership* v. *Beacon Industries, Inc.*, 239 Conn. 284, 295, 685 A.2d 305 (1996). "We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached." *Middletown Commercial Associates Ltd. Partnership* v. *Middletown*, 42 Conn. App. 426, 437, 680 A.2d 1350, cert. denied, 239 Conn. 939, 684 A.2d 711 (1996). Rather, the trial court's conclusion must stand "unless it is one that a trier [of fact] could not reasonably reach." *Foley* v. *Huntington Co.*, 42 Conn. App. 712, 731, 682 A.2d 1026, cert. denied, 239 Conn. 931, 683 A.2d 397 (1996). Therefore, as I believe that the handwritten provision at issue was ambiguous, its interpretation is a question of fact, reversible only if the trial court could not reasonably have arrived at the conclusion it did.

The trial court found that the handwritten provision at issue constituted a condition precedent that made the defendant's payments to the plaintiff contingent upon the project's being financed. The trial court further found that because the project was never financed, the defendant's duty to pay never came into existence.[1] On

---

[1] In court on September 5, 1995, the trial court, *Levine, J.*, ruled, "I find that there was an ambiguity in the initial contract, exhibit 2, about whether the $2000 was an estimate or a maximum cap, and when the plaintiff sent the defendant exhibit 4, asking that the defendant agree to increase the budget for item 10 in exhibit 2, from $2000 to $8000, that that is a very strong indication, from which I draw the inference, that the intent of the parties was that the $2000 would be a cap and not merely an estimate. And therefore, the increase in that cap from $2000 to $8000 constituted a consideration flowing from the defendant to the plaintiff, which supported the other provisions contained in exhibit 4, in particular supported the newly negotiated provision that's written in by hand, which says, 'Subject to payment, with all outstanding payments to be paid in full at time of financing of project,' which I find to mean that . . . . [w]hatever money became due after the execution of exhibit 4, and whatever money was due at the time of execution of exhibit 4, would all be contingent. The obligation to pay it would be contingent upon the project being financed, and the project

the basis of those determinations, the trial court found for the defendant on his third special defense[2] and rendered judgment in favor of the defendant on the complaint.

"A condition precedent is a fact or event which the parties intend must exist or take place before there is a right to performance. . . . A condition is distinguished from a promise in that it creates no right or duty in and of itself but is merely a limiting or modifying factor. . . . If the condition is not fulfilled, the right to enforce the contract does not come into existence. . . . Whether a provision in a contract is a condition the nonfulfilment of which excuses performance depends upon the intent of the parties, to be ascertained from a fair and reasonable construction of the language used in the light of all the surrounding circumstances when they executed the contract." (Citations omitted.) *Lach* v. *Cahill*, 138 Conn. 418, 421, 85 A.2d 481 (1951); see also *Sicaras* v. *Hartford*, 44 Conn. App. 771, 780, 692 A.2d 1290 (1997); J. Calamari & J. Perillo, Contracts (3d Ed. 1987) § 11-5, pp. 439–40.

"[T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." (Internal quotation marks omitted.) *24 Leggett Street Ltd. Partnership* v. *Beacon Industries, Inc.*, supra, 239 Conn. 295. The New World Dictionary defines

never having been financed, then the obligation having been contingent is dissolved, and so I find for the defendant on the third special defense, and as a result, I enter judgment in favor of the defendant on the complaint, and in favor of the plaintiff on the counterclaim and no costs to either party."

[2] The defendant's third special defense provides: "Said agreement as amended August 2, 1990 . . . conditioned any obligation on the part of the Defendant to make payments to the Plaintiff on the obtaining of financing for the project. Financing was never obtainable because the Plaintiff was unsuccessful in obtaining approval for the project."

"subject to" as "contingent or conditional upon," while Black's Law Dictionary defines "subject to" as "provided that." New World Dictionary (2d Ed. 1974); Black's Law Dictionary (6th Ed. 1990).

Moreover, the circumstances surrounding the execution of the contract and its amendments, as evidenced by a close examination of the record and transcripts, further support the reasonableness of the trial court's determination. The plaintiff's head engineer, Turner, initially advised the defendant that obtaining all of the necessary local commission approvals for the project should not be a problem. At a meeting on August 2, 1990, Turner explained to the defendant that his firm was having trouble acquiring the requisite commission approvals, and would need a lot more money in order to get the project approved. The defendant became upset, explained to Turner that the financing for the project was contingent upon these approvals, and further stated that he would make all outstanding payments to the plaintiff only when he obtained financing. The defendant handwrote the provision at the bottom of the February 8, 1990 letter, and Turner initialed it.

Furthermore, in the context of a large development project, a developer's conditioning his payment to an engineering company on the obtainment of financing for the project is a longstanding customary practice in the construction industry. See, e.g., *Douglas* v. *Nowakowski*, 141 Conn. 438, 440, 106 A.2d 468 (1954).

Therefore, I believe that the trial court's determination that the handwritten provision constituted an unfulfilled condition precedent that excused the defendant's performance was reasonable and, thus, should be affirmed.

Next, the majority, relying on a New Jersey case, an inapplicable Uniform Commercial Code section, and *Dills* v. *Enfield*, 210 Conn. 705, 720, 557 A.2d 517 (1989),

concludes that because the obtaining of financing for the project was an event within the sole control of the defendant, the nonoccurrence of this event should not excuse his performance under the contract and the defendant should have paid the plaintiff within a reasonable time. I disagree.

The problem with the majority's syllogism is that the act of obtaining financing for the project was not within the sole control of the defendant. Glastonbury Bank and Trust's financing of the project was contingent on the approval of the project by the Hebron inland wetlands commission and the Hebron planning and zoning commission. The plaintiff specifically contracted, in its original contract with the defendant, to take all actions necessary to obtain the required commission approvals, including preparation and submission of all plans and applications to the two commissions, as well as attendance at all commission meetings and public hearings.[3] The plaintiff was aware that the financing of the project was contingent on the plaintiff's obtaining the two commissions' approval of the project.

Furthermore, the majority has failed to cite any precedent binding on this court that supports their position. The majority's reliance on *Dills* v. *Enfield*, supra, 210 Conn. 705, is misplaced because *Dills* is distinguishable both factually and legally from this case. In *Dills*, the developer attempted to invoke a termination clause that allowed the developer to withdraw and to reclaim his deposit if, after the preparation of construction plans satisfactory to the agency, the developer could not obtain the necessary mortgage financing. Id., 707–708. The developer claimed that his inability to obtain mortgage financing for the project represented a superven-

---

[3] Item 10 of the original contract, dated June 16, 1989, provides as part of the plaintiff's services to the defendant, "Preparation and submission of plans and applications to and attendance of Inland Wetland Commission and Planning and Zoning Commission meetings and public hearings."

ing impracticability that discharged his duty to provide construction plans by a certain date. Id., 709–10. The attorney trial referee agreed with the developer, but the trial court rejected the referee's recommendation and instead held that the doctrine of impracticability and impossibility was not relevant to the case. Id., 710–11. Our Supreme Court agreed with the trial court that the doctrine of impracticability was inapplicable in *Dills*, and held instead that, " '[i]f an event is foreseeable, a party who makes an unqualified promise to perform necessarily assumes an obligation to perform, even if the occurrence of the event makes performance impracticable.' " Id., 720.

Here, the defendant argued that his duty to pay all outstanding payments never came into existence because of the unfulfilled condition precedent. Neither party argues anywhere that the defendant's duty to pay the plaintiff all outstanding payments was discharged under the doctrine of impracticability. The defendant in this case is arguing contractual interpretation, the enforcement of a bargained for contractual provision, not the application of the rarely used and exceptional doctrine of impracticability. Id., 717.

Moreover, in *Dills*, unlike here, the developer's inability to obtain financing, the event on which the developer relied to excuse his performance, was an event that the parties foresaw at the time of the execution of the contract, an event solely within the control of the developer, as well as a risk that the developer had explicitly contracted to bear. Id., 719–20. "Section 702 (b) of the contract allowed the developer to withdraw and to reclaim his deposit if, after the preparation of construction plans satisfactory to the agency, the developer could not obtain the necessary mortgage financing." Id., 708. This section of the contract "demonstrates that the parties expressly contemplated that [the developer] might encounter financial difficulties." Id., 719–20.

Nonetheless, despite this foreseeable problem, the developer specifically contracted to do everything necessary to obtain the mortgage financing. Id., 707–708 n.2, 719–20.

In the present case, the inability to obtain project financing, the event that excused the defendant's performance, was not foreseen by either party at the time of contracting, and thus was not a risk bargained for at the time of contracting, nor a risk explicitly assigned to one party by the contract. Further, here, the inability to obtain financing was not an event within the sole control of the party seeking excuse from his performance.

The majority further relies on *A. J. Wolfe Co.* v. *Baltimore Contractors, Inc.*, 355 Mass. 361, 364, 244 N.E.2d 717 (1969). First, a Massachusetts case is obviously not binding on this court. Second, the provision at issue in *A. J. Wolfe Co.*, contains no contingency language such as the "subject to" language found in the handwritten provision at issue in this case. Id. Instead, the disputed provision in *A. J. Wolfe Co.* clearly establishes a certain agreed upon time of payment. Id.

Because the handwritten provision on the February 8, 1990 letter was not so clear as to render its interpretation a matter of law, its interpretation is a question of fact, subject to the clearly erroneous standard of review. Further, the trial court's determination that the handwritten provision constituted an unfulfilled condition precedent that excused the defendant's performance was a reasonable determination and was not clearly erroneous. Thus, I conclude that the trial court properly found for the defendant on his third special defense and properly rendered judgment in favor of the defendant on the complaint. I would affirm the judgment of the trial court.