[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE:APPLICATION FOR TEMPORARY INJUNCTION
I. Introductory Statement
The plaintiff corporation has brought this action seeking a temporary injunction against the defendant, a former employee, to enjoin him from competing against the plaintiff in the commercial restoration business and to prohibit him from using its customer lists in soliciting customers. The defendant opposes the issuance of any injunctive relief on the grounds that the non-competition covenant he signed as part consideration for the sale of a similar type of business to the plaintiff and his employment contract is unenforceable either because the covenant is contrary to public policy or has terminated pursuant to its terms. CT Page 3766
The operative facts are as follows. At all times in question the plaintiff, Trans-Clean Corporation (Trans Clean) was in the business of exterior and interior restoration of commercial buildings, by means of pressurized water, sand blasting, plastic coating and painting; high pressure washing of commercial trucks and sales of equipment related to such tasks. The defendant was hired by the plaintiff in December, 1990 in connection with the plaintiff's purchase of Travel Washer, Inc., a similar type business which was owned by the defendant's father. At the time of this purchase Travel Washer was in direct competition with Trans Clean. The defendant was also CEO of Travel Washer. As part of that transaction, the defendant was hired by the plaintiff as a salesman and manager of its restoration division. His hiring was memorialized in a written agreement (Ex. B) and provided,inter alia, for a definite one year term of employment, a specific schedule of compensation based on gross sales and a promise to execute a non-competition covenant. This non-competition covenant (Ex. A) was executed simultaneously with the sales/employment agreement and was part of the consideration for defendant's secured employment.
In that non-competition covenant the defendant agreed, inter alia, not to compete directly with Trans-Clean, Inc., in a similar business within a sixty mile radius of Stratford, CT., the location of the plaintiff's home office, for a period of two years from the date of "completion of his . . . employment contract . . ." or any renewal thereof.
In late 1992 or early 1993 the defendant requested an increase in pay. The plaintiff acceded to this request and had its accountant draw up a new compensation schedule in which although the defendant's rate of compensation was increased, compensation was now based on net rather than gross sales. The plaintiff considered this transaction to be a renewal of the original employment agreement (Exhibit B). The defendant did not. Other than the income schedule prepared by the plaintiff's accountant there was no other written memorandum of this transaction. There is also no evidence that this writing prepared by the accountant makes reference to any renewal of the original agreement. Nor was there any discussion between the parties at the time of this transaction regarding defendant's employment security.
The defendant remained in the employ of the plaintiff for CT Page 3767 approximately 6 years from the execution of the original written employment contract until he suddenly resigned without prior notice in September, 1997. Shortly thereafter, the defendant began his own commercial restoration business and began soliciting business from the plaintiff's customers. At the present time the defendant continues to solicit business from customers appearing on Trans Clean's customer list.
II. Customer Lists as Trade Secrets.
All customer lists in question were derived from either door to door or telephone soliciting or responses to advertising leads and from the corporation's accounting records. Exhibit I is the customer/contact list developed almost exclusively through the efforts of the defendant employing the above mentioned techniques as well as resort to a trade publication listing the businesses and the names of their contact persons. This publication was available at the public library. The customers on Exhibit I were periodically added to Exhibit H. Exhibit H is a master customer list which was generated by the plaintiff's sales force in each of the operating divisions. The only provisions for maintaining the secrecy of the names on this master list was by placing the acquired data in a computer data bank maintained in the plaintiff's computer memory and installing a secret electronic password for accessing them. This list was printed out from time to time but was not generally available to everyone and the hard copies were kept under lock and key and retained by the officers of the corporation. The defendant only had access to Exhibit H on a need to know basis. Each salesperson maintained his own contact/customer list. No salesperson had access to any other's contact/customer list except possibly through the master data bank. The defendant did not have access to any other salespersons' contact/customer list.
There was no unique method or process of compiling customer/contract lists with the corporation. Each salesperson was responsible for developing his own contact/customer list, maintaining contact with those customers and collecting their accounts. The defendant would merely go through the yellow pages, locate potential customers whom he suspected would have need for the corporation's services, call or visit them and ask for the facilities manager or equivalent person who would then become the contact person for all future business relations. He would also over time develop a special rapport with those businesses/contact persons with whom he dealt on a regular basis. Other than that, CT Page 3768 there was no special relationship developed between the company salespeople and their business contacts.
At no time relevant hereto was there ever any company policy with regard to maintaining secrecy of customers or contact persons. Nor did the plaintiff ever discuss with or direct the defendant to maintain these lists in secret. There is no doubt, however, because of the collective time put into developing them, these lists in their complied state were a convenient solicitation tool to the defendant or any potential competitor of the plaintiff. Thus, their value lies not in the development process but in the time saved by the convenience of having such lists available.
Because of the defendant's job requirements, he had over the years acquired knowledge of the plaintiff's bidding strategies, overhead and performance capabilities. However, there is no evidence that there was any concerted effort on the part of the plaintiff to keep these attributes secret from outsiders or competitors or that they were in any way unique to the industry.
As part of his employment responsibilities the defendant often prepared work proposals for Trans Clean's customers. Just prior to his resignation, the defendant prepared job proposals for two of the plaintiff's customers. Upon resignation, defendant solicited these customers with his own proposals for the same work which either substantially undercut or were equal to the prices he proposed while employed by Trans Clean. His proposals were accepted.
The defendant has solicited business from and done business with several former customers of Trans Clean following his resignation from Trans Clean. Furthermore, the defendant continues to solicit restoration business from the plaintiff's customers. In obtaining business, the defendant concedes that he used an old customer list that he had compiled while in the employ of the plaintiff and which was substantially similar to plaintiff's current customer list. (Ex. I). The defendant has also conceded that this list as well as Exhibit I were the property of the plaintiff.
III. The Covenant.
The 60 mile radius of prohibited competition encompasses approximately 75% of the area of the state of Connecticut CT Page 3769 including the 6 major metropolitan areas in the state (Bridgeport, New Haven, Hartford, Waterbury, Stamford and Danbury). It also reaches south to include most of New York City (4 out of the five boroughs), Long Island and all of Westchester county and a small part of northeastern New Jersey. Although the plaintiff has 5 service divisions, restoration represents the largest single division amounting to approximately 35%-40% of its total business operations. Trans Clean's gross income from all operations is approximately $4.5 million per year. At the present time the vast majority (75%-80%) of the plaintiff's business is with firms based within the state of Connecticut. The business that it does do with firms based in Westchester county represents about 5% of its total business. Substantially all of its jobs/contracts now pending in N.J., Queens, N.Y. and L.I. were solicited or obtained from firms based in Connecticut but having properties in other states where the plaintiff performed its services. The plaintiff now advertises in the yellow pages in various areas in the state of Connecticut and in Westchester county. It does no advertising in the City of New York or on L.I. or N.J. Furthermore, there is no evidence that the plaintiff has ever actively promoted its business (advertising, door to door or phone solicitation) except in the state of Connecticut or Westchester county. Trans Clean is licensed to do business in New York state, but there is no evidence that it is licensed to do business in any part of N.J. At the time the plaintiff purchased Travel Washer it was a competitor and 99% of Travel Washer's customers were in Connecticut.
The defendant is married and supports 9 children. At the time the defendant was employed by Trans Clean he had 20 years experience in the commercial restoration/pressure washing business which he gained while working in his father's business since he was 14 years old. As a result of this experience the defendant had hands-on knowledge of all facets of the business at the time of the purchase. Furthermore, the commercial restoration and pressure washing field is the only field in which he ever worked. His primary considerations for signing the employment contract in question were three fold: job security, substantially the same income and that he would not have to look for a new job. His current business operations is limited to commercial restorations.
I. The Contract and Renewal of the Employment Agreement.
The defendant argues that his agreement with the defendant was, by the terms of the contract language, limited to one year. CT Page 3770 The defendant claims that this employment agreement was never renewed, and thus he is an at will employee. As such, the defendant claims that he was free to leave his employment at any time following the completion of his year term and not be bound by any of the restrictive covenants therein. In its application for a temporary injunction, the plaintiff argues that the evidence of the case reveals that the employment agreement between the plaintiff and the defendant has been renewed and modified, and thus the agreement is still binding. The plaintiff claims that the defendant is not merely an at will employee, but rather under contract and bound by the explicit terms of the agreement
The intent of the parties is to be ascertained by a fair and reasonable construction of the written words and the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. DeCarlo Doll, Inc. v. Dilozir, 45 Conn. App. 633,648, 698 A.2d 318 (1997).
Ordinarily the question of contract interpretation is a question of fact. However, where there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. In such a situation our scope of review is plenary. Id., 638. When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract. Id., 638. In addition, the circumstances surrounding the making of the contract, the purposes which the parties sought to accomplish and their motives cannot prove an intent contrary to the plain meaning of the language used. Finally, the court should not torture words to impart ambiguity for same. Id., 638.
In the present case, the agreement in question is open to dispute and thus there is a question of fact to be answered by the trier. This court finds that the defendant's employment was "at will." The defendant's original employment agreement provided for a one year term of employment. When the defendant requested an increase in pay, the plaintiff acceded and drew up a new compensation scale. While the plaintiff considered this transaction to be a renewal of the original employment agreement, the defendant did not. Other than the income schedule prepared by the plaintiff's accountant there was no other written memorandum of the transaction. There is also no evidence that this writing prepared by the accountant makes reference to any renewal of the original agreement. Nor was there any discussion between the CT Page 3771 parties at the time of this transaction regarding defendant's employment security. Thus, following the completion of his one year term, the defendant was free to leave his place of employment at any time. Of course, the plaintiff, reciprocally, could have freely terminated the defendant if it so chose.
However, any obligation by the defendant to abide by the terms of the covenant not to compete did not expire merely because the defendant became an employee at will. Does this mean that defendant was bound not to compete following termination of his at will employment? The answer is yes. In construing an agreement, all of the relevant provisions of the agreement must be interpreted as a whole. Beckenstein v. Potter Carrier, Inc.,191 Conn. 120, 134, 464 A.2d 6 (1983). The contract between the plaintiff and the defendant provides that the non-compete agreement was operative if the defendant "is employed by [the plaintiff] for at least a three (3) year period, or a shorted period if he voluntarily resigns, he shall not compete with the Buyer within sixty (60) miles from Stratford for a period of two (2) years after that date of termination. If, however, [the defendant] is terminated within the three (3) year term of employment period from the date hereof, all ownership of the `customer list' shall revert back to [the defendant] and become [the defendant's] property and any Covenant not to Compete shall become inoperative and null and void." (Exhibit A.)
Under this paragraph, the plaintiff contractually guaranteed the defendant that he would be employed by the plaintiff for at least a period of three years. In consideration of this guarantee, the defendant agreed to the non-compete agreement. Under the terms of the contract, the non-compete agreement could be triggered in one of two ways. If either the defendant decided to voluntarily quit or was terminated by the plaintiff prior to three years employment. Only then would there be a valid non-compete agreement. Under either scenario, the defendant would have been secure in his job for three years because the plaintiff would have no incentive to terminate the defendant as this would nullify the non-compete agreement.[1]
Consequently, the defendant should be bound by the non-compete agreement if that agreement is found to be reasonable. According to the plain language of the agreement, the defendant was bound by the non-compete clause for a time period of two years following the completion of his employment. CT Page 3772
II. Non-compete Agreement
A covenant that restricts the activities of an employee following the termination of his employment is valid and enforceable if the restraint is reasonable. Scott v. General Iron Welding Co., 171 Conn. 132, 137, 368 A.2d 111 (1976). The five factors to be considered in evaluating the reasonableness of a restrictive covenant ancillary to an employment agreement are: (1) the length of time the restriction operates; (2) the geographic area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests. Robert S.Weiss Associates, Inc. v. Wiederlight, 208 Conn. 525, 529 n. 2,546 A.2d 216 (1988). The five prong test of Scott is in the disjunctive, rather than the conjunctive; therefore, a finding of unreasonableness in any one of the criteria is enough to render the covenant unenforceable. New Haven Tobacco Co. v. Perrelli,18 Conn. App. 531, 534, 559 A.2d 715, cert. denied, 212 Conn. 809,564 A.2d 1071 (1989).
Generally, the "application of a restrictive covenant must be confined to a geographic area that is reasonable in view of the particular situation." Scott v. General Iron Welding Co.,supra, 171 Conn. 138. In the present case, the defendant claims that the sixty-mile radius originating from the plaintiff's headquarters in Stratford is overly expansive and unreasonable. The plaintiff argues that the sixty-mile radius is reasonable because it encompasses areas where the plaintiff actively conducts business.
The geographic scope of a particular restrictive covenant is not the deciding factor in finding a restriction reasonable or not. See Scott v. General Iron Welding Co., supra,171 Conn. 137 (statewide restriction found reasonable); Robert S. Weiss Associates, Inc. v. Wiederlight, supra, 208 Conn. 531 (ten-mile radius found reasonable); cf. New England Ins. Agency, Inc. v.Miller, Superior Court, judicial district of New Haven at New Haven, Docket No. 285030 (April 16, 1991) (Healey, S.T.R.) (twenty-five mile restriction found unreasonable. Rather, the general rule is that the application of a restrictive covenant will be confined to a geographical area which is reasonable in view of a particular situation. A restrictive covenant which protects the employer in areas in which he does not do business or is unlikely to do business is unreasonable with respect to the area. Scott v.
CT Page 3773General Iron Welding Co., supra, 171 Conn. 138.
In the present case, the evidence supports a showing that the plaintiff's profitable business has expanded in recent years and the plaintiff has conducted business in seemingly distant areas that are near the outermost perimeter called upon by the sixty-mile restrictive radius. However, the evidence does not support a finding that the plaintiff is likely to actively conduct its business within the entire sixty-mile radius. To the contrary, the evidence shows that the plaintiff's pending contracts in New Jersey, Queens, and Long Island were solicited or obtained from Connecticut firms owning additional property in the those areas and although the plaintiff advertises in various parts of Westchester county, there is no evidence that the plaintiff actively conducts its business in any other areas of New York and New Jersey which are also covered by the non-compete agreement. Indeed, the vast majority of the plaintiff's business (75% — 80%) is with firms based in Connecticut. While the plaintiff need not generally pursue or conduct business in every single town within a restricted area,[2] its business in areas such as New York City and New Jersey is merely on offshoot of its Connecticut business. The protection of these offshoot areas via the non-compete agreement is unreasonable.
A restrictive covenant is unenforceable if by its terms the employee is precluded from pursuing his occupation and thus prevented from supporting himself and his family. May v. Young,125 Conn. 1, 5, 2 A.2d 385 (1938). In the present case, the defendant has continuously engaged in the commercial restoration/pressure washing business since the age of fourteen and has pursued the occupation his entire adult life. The defendant is married and supports nine children. And while it is true that the vendor of a business may subject himself to a degree of restriction in non-compete clauses which may not be permitted to an employee; Mattis v. Lally, 138 Conn. 51 (1951); it cannot be said that the plaintiff should be permitted to restrict the defendant to the degree in which it has in the non-compete clause at hand. It is noteworthy that the customers of defendant's former business were almost entirely (99%) from Connecticut. While the purchase of a business entitles the buyer to protection of that business' good will, it is hard to see why this good will should be protected in areas where it does not even exist.
For these reasons the court concludes that the non-compete agreement between the parties is unreasonable. Furthermore, the CT Page 3774 geographical area contemplated by the non-compete agreement is indivisible and thus cannot be rewritten by the court under the so-called "blue pencil rule." Timenterial, Inc. v. Dagata,29 Conn. Sup. 180, 184, 277 A.2d 512 (1971). See also Roy v. Smith Associates v. Galullo, Superior Court, judicial district of Hartford/New Britain at Hartford, Docket No. 308779 (November 15, 1985) (Satter, J.). Therefore, the non-compete agreement in its entirety is unenforceable due to its unreasonableness.
III. Customer lists as Trade Secrets.
A trade secret may consist of any formula, pattern, device, or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound or a list of customers. Robert S. Weiss Associates, Inc. v. Wiederlight, supra, 208 Conn. 538. Depending on the nature of the business, a customer list may be a trade secret, and an employee may be restrained from using the list if he acquired it in confidence from his employer. There is no trade secret, however, if the customers' names can be readily ascertained through ordinary business channels or reference sources. Id.
Although it is not essential that the proprietor have exclusive possession of the information, a substantial element of secrecy must exist, to the extent that there would be difficulty in acquiring the information except by the use of improper means. To determine whether a substantial element of secrecy exists, our Connecticut courts have looked to a number of factors including: 1) the extent to which the information is known outside the business; 2) the extent to which it is known by employees and others involved in the business; 3) the extent of measures taken by the employer to guard the secrecy of the information; 4) the value of the information to the employer and his competitors; 5) the amount of effort or money expended by the employer in developing the information and 6) the ease or difficulty with which the information could be properly acquired or duplicated by others. Town Country Homes Service, Inc. v. Evans,150 Conn. 314, 319, 189 A.2d 390 (1963). These factors exist to assist the court in its determination of the issue at hand, but need not be accorded equal weight or consideration. Holiday Food Co. v.Munroe, 37 Conn. Sup. 546, 551, 426 A.2d 814 (1981). Whether a particular use of a customer list by a former employee constitutes an exercise of his right to use general knowledge and experience CT Page 3775 gained in the former employment, or whether it violates his confidential relationship with his former employer not to use trade secrets or confidential information acquired in the course of his former employment, will depend generally on the particular facts and circumstances involved. Id. It is a question of fact to be determined by the trial court.
In the present case, the defendant has conceded to using an old customer list. This old customer list was complied by the defendant while in the employ of the plaintiff and is substantially similar to the plaintiff's current customer list. While the plaintiff did keep the various customer lists in secrecy to some extent, the evidence reveals that these lists were not necessarily trade secrets as such. The lists were more a matter of convenience than the results of a secretive developmental process. Each salesperson employed by the plaintiff was responsible for developing his or her own list of customers. The defendant testified that he had developed his list by scanning the yellow pages and soliciting potential clients via phone, or finding potential customers in various trade magazines easily accessible to the public. Over a course of time, the defendant would develop a special rapport with various contact people representing these solicited businesses. Customer lists readily ascertainable through ordinary business channels are not afforded the protection of a trade secret. Beekley Corp. v. Doyle,
Superior Court, judicial district of Hartford/New Britain at New Britain, Docket No. 466681 (January 17, 1996) (Handy, J.). While the plaintiff did keep master lists of customers away from salespeople, except on a need to know basis, there is no evidence that there was ever any company policy with regard to maintaining the secrecy of customers or contacts. Therefore, for all of the foregoing reasons, the customer list used by the defendant were not a trade secret.
In the present case the court finds the non-compete agreement is unreasonable and the defendant has not appropriated any trade secrets of the plaintiff. It is, therefore, unlikely that plaintiff will prevail on this case at the trial on the merits. Plaintiff's application for temporary injunction to enjoin competition and the use of the customer lists in question is hereby DENIED.
MELVILLE, J.