# WILLIAM J. LAVELLE *v.* ECOAIR CORPORATION ET AL.

## (AC 22357)

Mihalakos, Flynn and Dupont, Js.

Argued September 17, 2002—officially released February 4, 2003

*Bernard Pellegrino*, for the appellant (plaintiff).

*John T. Harris*, with whom was *Sheila A. Huddleston*, for the appellees (defendants).

*Opinion*

MIHALAKOS, J. The plaintiff, William J. LaVelle, appeals from the trial court's judgments in favor of the defendants, Ecoair Corporation (Ecoair) and its president, Peter S. Knudsen, Jr., in an action for breach of an employment contract. Additionally, the plaintiff appeals from the judgment in favor of Knudsen on Knudsen's counterclaim for the repayment of a loan made to the plaintiff. On appeal, the plaintiff claims that the court improperly found that (1) the terms of a proposed employment agreement had neither been agreed to nor adopted by the parties, (2) the plaintiff was not entitled to severance pay under the terms of a letter agreement, (3) Ecoair was entitled to offset its obligation to the plaintiff for vacation pay by the amount of insurance benefits it paid on his behalf after his employment with Ecoair terminated, and (4) the plaintiff's debt to Knudsen was due and payable. We affirm the judgment of the trial court on the complaint and on the counterclaim.

The following undisputed facts and procedural history are relevant to our resolution of the plaintiff's appeal. In 1991, the plaintiff began working for Ecoair, providing marketing, fund-raising and management services for the company. The plaintiff received shares of Ecoair stock in lieu of salary until the latter part of 1992, when he began receiving a salary. In 1993, the plaintiff purchased additional shares of Ecoair stock.

Subsequently, the plaintiff and Ecoair formalized their arrangement by entering into a signed, written employment agreement dated December 13, 1993 (1993 agreement), which provided, among other things, for the plaintiff's employment as Ecoair's executive vice president and for his receipt of an annual salary of $132,500. The 1993 agreement contained a "termination for cause" provision and a provision permitting nonrenewal of the agreement by either party on an annual basis after proper notice (nonrenewal provision),[1] but it did not include a termination without cause provision, nor did it provide for any severance pay. Additionally, the 1993 agreement contained a provision governing modification of its terms (modification provision).[2]

In 1993 and 1994, Ecoair's board of directors consisted of Knudsen, Ecoair's president; the plaintiff, its

[1] Paragraph one of the 1993 agreement (nonrenewal provision) provides: "1. Employment. [Ecoair] hereby employs [the plaintiff] and [the plaintiff] hereby accepts employment with [Ecoair] upon the terms and conditions herein set forth. Such employment is for successive terms of one (1) year, unless sooner terminated as provided in this [a]greement. Each one-year term shall be automatically renewed unless one party gives notice to the other party of his or its intention not to renew this agreement not less than ninety (90) days before the expiration of the then current one (1) year term."

[2] Paragraph fifteen of the 1993 agreement (modification provision) provides: "15. Modification; Entire Agreement. No modification, amendment, extension or alleged waiver of this [a]greement or any provision hereof shall be binding upon [Ecoair] or [the plaintiff] unless in writing and signed by both [Ecoair] and [the plaintiff]. This [a]greement constitutes the entire agreement and understanding between [Ecoair] and [the plaintiff] relating to the latter's employment, and supersedes and replaces all prior agreements and understandings, written or oral, relative to such employment."

executive vice president; and Richard D. Crane, its treasurer and chief financial officer. In late 1994 or early 1995, Knudsen asked Crane and the plaintiff to resign from Ecoair's board at a meeting scheduled for February 17, 1995.

In early 1995, Crane contacted an attorney for Ecoair, John Clark, to discuss the effects of the proposed resignations from the board. Attorney Clark prepared drafts of new employment agreements for Crane and the plaintiff, respectively (1995 agreements).

On February 17, 1995, Crane met with Knudsen and presented unexecuted copies of the 1995 agreements to him. Crane also submitted a conditional letter of resignation from the board and expressed concerns regarding his and the plaintiff's rights in the event that they were ever terminated without cause. Knudsen asked Crane to take back his conditional letter of resignation and to submit an unconditional resignation from the board. In turn, Knudsen furnished letters to Crane and to the plaintiff discussing, among other things, the availability of severance pay in the event of a termination without cause (letter agreement).[3] Thereafter, on February 17, 1995, the plaintiff and Crane submitted signed letters of resignation from Ecoair's board of directors, and the board accepted their resignations. Subsequently, on February 27, 1995, attorney Clark forwarded revised drafts of the 1995 agreements to the plaintiff and to Crane.[4]

---

[3] Knudsen's letter to the plaintiff dated February 17, 1995, was signed by Knudsen and states in relevant part: "In accordance with our discussions regarding your employment agreement with Ecoair, the Company has agreed to modify the termination provisions of your agreement, so that in the event of termination without cause you will have the right to . . . severance at full pay subject to Ecoair's ongoing ability to pay will be thirty-six months if terminated in 1995, twenty-four months if terminated in 1996, and twelve months thereafter."

[4] At trial, the plaintiff testified about his belief that a version of the 1995 agreement had been executed and that it thereafter governed the terms of his employment relationship with Ecoair. Crane testified that he did not recall ever signing any draft of the 1995 agreement. The plaintiff and Crane

In 1995, the plaintiff's annual salary increased from $132,500 to approximately $165,625. In January, 1996, however, Ecoair's board of directors compensation committee voted to reduce the salaries of the plaintiff, Crane and Knudsen. Specifically, the plaintiff's salary was reduced from $165,625 to $100,000.[5]

The plaintiff told Knudsen that he and his family could not afford such a substantial reduction in salary. In response, Knudsen offered to loan the plaintiff $6500 per month from Knudsen's personal funds, for a total of $78,000 over the course of the year in 1996. There is no written agreement as to the terms of repayment of the loan. The parties, however, agree that the loan was to be repaid to Knudsen free of interest when the plaintiff sold his Ecoair stock. The plaintiff accepted the total amount of $78,000 in loan funds. The plaintiff has not sold any of his stock since the loan was made and admits that he owes Knudsen $78,000.

The plaintiff's employment relationship with Ecoair continued until 2000. By a letter dated September 11, 2000, Ecoair gave the following notice to the plaintiff: "In accordance with paragraph [one] of the [e]mployment [a]greement between you and Ecoair Corp. dated December 13, 1993,[6] Ecoair is hereby notifying you of its intention not to renew this [e]mployment [a]greement." The letter was signed by Knudsen in his capacity as Ecoair's president and delivered by Knudsen to the plaintiff. Thereafter, on December 12, 2000, the plaintiff's employment with Ecoair terminated.

In 2001, the plaintiff commenced an action against Ecoair and Knudsen in the Superior Court alleging,

testified, however, that they were unable to locate a signed copy of any version of the 1995 agreement.

[5] The plaintiff testified that from 1996 through 2000, his annual salary remained at $100,000.

[6] See footnote 1.

among other things, wrongful termination of the 1995 agreement, and breach of the verbal and written employment terms and conditions.[7] Knudsen interposed a counterclaim in the amount of $78,000, representing the loan in that amount made to the plaintiff during 1996. Following a trial to the court, the court issued a memorandum of decision, rendering judgment in favor of the defendants on the complaint and in favor of Knudsen on his counterclaim.[8] This appeal followed. Additional facts will be set forth as necessary.

Our review of the plaintiff's appeal is governed by the well established principle that "an appellate court will overturn the factual findings of a trial court only if these findings are clearly erroneous. . . . A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence

[7] Specifically, the plaintiff alleged the following four counts in his amended complaint, the first two of which are involved in this appeal: Count one alleged that Ecoair wrongfully terminated the 1995 agreement; count two alleged that Ecoair breached employment terms and conditions that had been agreed on by the parties both verbally and in writing; count three alleged that Knudsen acted in bad faith, and interfered with the employment relationship between the plaintiff and Ecoair; and count four alleged that Knudsen breached fiduciary duties. The plaintiff's fourth count was dismissed, and neither his third nor fourth counts are at issue in this appeal.

[8] In its memorandum of decision, the court stated: "If the 1993 [agreement] is found to be the controlling document, then [the] letter dated September 11, 2000 . . . to the plaintiff would be effective as a nonrenewal of that contract, effectively limiting any recovery by the plaintiff to the terms of the 1993 [agreement]." The court determined, among other things, that: (1) no written or oral modification of the 1993 agreement was effected by the 1995 agreement; (2) the sole modification to the 1993 agreement was contained in the letter agreement from Knudsen to the plaintiff dated February 17, 1995, although that letter agreement did not create a severance pay requirement under the circumstances of the case; (3) pursuant to the 1993 agreement, the plaintiff was entitled to an amount of $3636.34 from Ecoair as payment for unused vacation days; however, that amount was to be offset by the amount of funds advanced by Ecoair toward the plaintiff's health insurance premiums subsequent to the termination of his employment and, therefore, the plaintiff was entitled to the balance of $151.63; and (4) the plaintiff's debt to Knudsen on the 1996 loan in the amount of $78,000 as alleged in Knudsen's counterclaim was due and payable.

is left with the definite and firm conviction that a mistake has been committed. In applying the clearly erroneous standard to the findings of a trial court, we keep constantly in mind that our function is not to decide factual issues de novo. Our authority, when reviewing the findings of a judge, is circumscribed by the deference we must give to decisions of the trier of fact, who is usually in a superior position to appraise and weigh the evidence." (Citation omitted; internal quotation marks omitted.) *Douthwright* v. *Northeast Corridor Foundations*, 72 Conn. App. 319, 323, 805 A.2d 157 (2002).

I

The plaintiff's first claim on appeal is that the court improperly found that the terms of the 1995 agreement had neither been agreed to nor adopted by the parties. Specifically, the plaintiff argues that the 1995 agreement modified and replaced the 1993 agreement, controlled his employment relationship with Ecoair since February, 1995, and, therefore, sets forth the terms for his recovery upon the termination of his employment. Furthermore, he contends that although no signed copy of the 1995 agreement ever was introduced into evidence at trial,[9] the court could have concluded from the weight of other evidence that the parties had agreed to its terms. In response, the defendants argue that the court reasonably found that the parties never agreed to adopt the 1995 agreement. We agree with the defendants.

"For a valid modification to exist, there must be mutual assent to the meaning and conditions of the modification and the parties must assent to the same thing in the same sense. . . . Modification of a contract may be inferred from the attendant circumstances and conduct of the parties. . . .

[9] See footnote 4.

"Whether the parties to a contract intended to modify the contract is a question of fact. . . . The resolution of conflicting factual claims falls within the province of the trial court. . . . The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witness[es]." (Citations omitted; internal quotation marks omitted.) *Herbert S. Newman & Partners, P.C.* v. *CFC Construction Ltd. Partnership*, 236 Conn. 750, 761–62, 674 A.2d 1313 (1996).

In its memorandum of decision, the court sought to determine whether the 1995 agreement modified or replaced the 1993 agreement as the controlling employment contract between the parties. The court noted the following language contained in the modification provision of the 1993 agreement: "[n]o modification, amendment, extension or alleged waiver of this [a]greement or any provision hereof shall be binding upon [Ecoair] or [the plaintiff] unless in writing and signed by both [Ecoair] and [the plaintiff]." Furthermore, the court noted that Knudsen denied ever signing any version of the 1995 agreement and, although the plaintiff testified that a signed version once existed, he failed to produce an executed copy and was unable to say which one of two versions ever had been signed.

The court determined that it was required to examine the surrounding circumstances for indications that the parties acted in accordance with the terms of the 1995 agreement or in other ways to suggest that they had adopted its terms. The court considered the testimony of the parties and witnesses at trial for evidence to support execution, adoption or ratification of the 1995 agreement. It found that the testimony of the witnesses at trial failed to support the plaintiff's assertion that the 1995 agreement had been executed. Moreover, it

specifically stated: "The court does not find the plaintiff's explanation about the disappearance of the signed [1995] agreement credible. He suggests that he had such a copy and that it mysteriously disappeared from his file or from the company's file. Crane had no signed copy and could not recall signing one, [and] the attorney [Clark] who prepared it had no record of the execution of a final draft . . . ."

The court also found an absence of evidence of actions taken or routines followed by the parties that adhered to the 1995 agreement, tending to support the plaintiff's allegation that the parties acted as though it were in effect. It considered the salary and vacation provisions of the drafts of the 1995 agreement, which provided for a salary of $165,625 per annum with annual increases and six weeks annual vacation time. The court found that the actual salary received by the plaintiff after 1995 demonstrated that the 1995 agreement's salary provisions had not been implemented, and, furthermore, that the plaintiff never took the six weeks of vacation set forth in the drafts. The court concluded that no written or oral modification of the 1993 agreement was effected by the 1995 agreement.

Having reviewed the entire record, we conclude that there is ample evidence to support each of the factual findings made by the court. The court reasonably found that the evidence and the record, as a whole, failed to demonstrate the parties' mutual assent to the meaning and conditions of the 1995 agreement. Consequently, we conclude that the court's finding that the 1995 agreement had neither been agreed to nor adopted by the parties was not clearly erroneous. Accordingly, we reject the plaintiff's first claim.

II

The plaintiff's second claim is that the court improperly found that he was not entitled to severance pay

under the terms of the letter agreement from Knudsen dated February 17, 1995.[10] The plaintiff argues that because the court found that the letter agreement modified the 1993 agreement,[11] the letter agreement entitles him to severance pay for one year subsequent to his termination. Specifically, the plaintiff contends that the letter agreement's provision for severance pay operates *in concert* with the nonrenewal provision of the 1993 agreement and that the only way the 1993 agreement, as modified, could be terminated without cause was by way of nonrenewal. Furthermore, the plaintiff maintains that the evidence does not support the court's alternate finding that Ecoair was not required to pay severance to the plaintiff because it lacked an ongoing ability to pay.

In response, the defendants argue that the court reasonably found that the plaintiff was not entitled to severance pay under the terms of the 1993 agreement, as modified by the letter agreement from Knudsen. The defendants contend that the letter agreement's provision for severance pay operates *separately* from the nonrenewal provision of the 1993 agreement and that it was not implicated because the plaintiff's employment was not terminated without cause but was simply not renewed. Alternatively, the defendants argue that even if the letter agreement's provision for severance pay was implicated, the court properly found that Ecoair was not obligated to pay severance because Ecoair lacked an ongoing ability to pay. We agree with the defendants.

In its memorandum of decision, the court found that the sole modification to the 1993 agreement was con-

---

[10] See footnote 3.

[11] We need not address the issue of whether the letter agreement effectively modified the 1993 agreement because the parties have not addressed that issue. We note that the plaintiff's second claim and the parties' arguments with respect to that claim assume that the letter agreement effectively modified the 1993 agreement.

tained in the letter agreement from Knudsen to the plaintiff dated February 17, 1995, but that the letter agreement did not create a severance pay requirement under the circumstances of the case, on two independent grounds. First, the court found that the letter agreement's termination without cause provision neither replaced the 1993 agreement's nonrenewal provision nor added a severance pay requirement to that nonrenewal provision.[12] The court based its finding on the words contained in the letter agreement, finding significant the statement that Ecoair agreed to modify "the termination provisions of [the plaintiff's] agreement . . . ." The court explained that the nonrenewal provision of the 1993 agreement was included under the paragraph labeled "employment," rather than under the paragraphs containing the word "termination" in their labels. Thus, the court determined that the letter agreement's severance pay provisions were not implicated under the circumstances because the parties' employment relationship ended in accordance with the nonrenewal provision of the 1993 agreement. We do not resolve that question of law, which is based on an interpretation of the parties' employment agreement and the letter, in light of the court's alternate determination.

Second, and critical to our resolution of the plaintiff's second claim, the court found that even if the letter agreement's severance pay provisions were implicated by the manner in which the plaintiff's employment was

[12] Rather, the court found that the letter agreement created a mechanism for Ecoair to terminate the plaintiff's employment at any time without cause, but that if Ecoair exercised that right, it would be obligated to comply with the terms providing for severance pay specified in the letter agreement. In contrast, the court found that the 1993 agreement provided a mechanism for nonrenewal of the parties' employment relationship that was available to either party, but that if either party sought to invoke that mechanism, they would be required to notify the other party at least ninety days prior to the expiration of the then current one year term of employment.

terminated, the plaintiff was not entitled to such payments because the letter agreement expressly conditioned Ecoair's payment obligation on its "ongoing ability to pay." The court found that in 2000 and at the time of trial, Ecoair operated with substantial losses and lacked an "ongoing ability to pay" severance to the plaintiff. The court's finding was based in part on Knudsen's testimony regarding Ecoair's past, present and future financial difficulties, and in part on Ecoair's income statement covering the period from February, 2000, through February, 2001.

Even if we were to agree with the plaintiff's argument that the letter agreement's severance pay provisions were implicated by virtue of the termination of his employment, we cannot ignore the court's factual finding that Ecoair lacked an ongoing ability to pay. In his appellate brief, the plaintiff disputes that finding and advances various interpretations of Ecoair's income statement, which he claims demonstrates Ecoair's ongoing ability to pay. All that we have before us are repeated assertions in the plaintiff's brief that ask us to ignore the court's finding and to adopt his interpretation of the evidence. In effect, the plaintiff would have us decide this case on facts directly opposite to those found by the court. "It is axiomatic that this court cannot find facts. This case must be reviewed on the facts found by the trial court." *Anquillare, Lipnicki, Ruocco & Co.* v. *VCR Realty Associates*, 72 Conn. App. 821, 825, 808 A.2d 682 (2002).

In light of the evidence and pleadings of record, we do not find the court's factual findings clearly erroneous. There is evidence to support the court's findings and, after review, we are not left with the definite and firm conviction that a mistake has been made. Accordingly, we reject the plaintiff's second claim on the basis that the letter agreement for severance pay was contingent on Ecoair's ongoing ability to pay.

## III

Next, the plaintiff claims that the court improperly found that Ecoair was entitled to offset its obligation to pay him for unused vacation time by the amount of insurance benefits it paid on his behalf after his employment with Ecoair terminated.[13] Specifically, the plaintiff argues that Ecoair *voluntarily* paid his health insurance premiums for two months after his employment ended, in January and February, 2001, and, therefore, Ecoair was not entitled to a setoff for its voluntary payments. In response, the defendants argue that the court reasonably relied on the testimony of Richard Wisot, Ecoair's former chief financial officer, as the basis for its finding that Ecoair was entitled to the setoff. The defendant maintains that the court reasonably found that Ecoair was entitled to offset its obligation for vacation pay by the amount of insurance benefits it paid for the plaintiff subsequent to the end of his employment. We agree with the defendants.

In its memorandum of decision, the court found that although the plaintiff was due an amount of $3636.34 from Ecoair as payment for unused vacation days, that amount was to be offset by the amount of funds advanced by Ecoair toward the plaintiff's health insurance premiums.[14] The court ultimately found that the

[13] The portion of the court's memorandum on that issue states: "There remains in dispute the question of whether the amount advanced by Ecoair to pay the plaintiff's health insurance premiums should offset the amount due the plaintiff for nine vacation days, $3636.34. That figure is not disputed.

"Relying on the testimony of [Richard] Wisot, the court concludes that it should. The plaintiff did not give Ecoair notice to end his coverage and Ecoair made the payments which created a benefit available to the plaintiff, though he may not have enjoyed the actual use of it.

"The court concludes the plaintiff is entitled to the balance of $151.63 offered by the defendant."

[14] At trial, the parties agreed that if the 1993 agreement was found to be the operative employment contract, then under that agreement, at the time that the plaintiff's employment ended, the plaintiff was entitled to $3636.34 representing nine days of pay for unused vacation time. Prior to trial, Ecoair tendered payment of $1354.71 for vacation pay owed to the plaintiff. Ecoair

plaintiff was entitled to the balance amount of $151.63. As the basis for its determination, the court explained that it relied on Wisot's testimony and found that the plaintiff had failed to give Ecoair notice to discontinue his coverage.

At trial, Wisot testified that insurance premiums were paid at the beginning of each month and that Ecoair could cancel insurance coverage only at the end of the month for the following month. He testified that Ecoair already had paid the plaintiff's health insurance premiums for December, 2000, because the plaintiff's employment with Ecoair continued until mid-December. Moreover, he testified that in December, 2000, shortly after the plaintiff's employment with Ecoair ended, Ecoair sent a notice to the plaintiff, explaining that he was required to notify the company if he wanted to discontinue his insurance benefits. Furthermore, Wisot testified that if the plaintiff had notified Ecoair that he wanted to terminate his coverage, Ecoair would not have been obligated to continue paying the premiums. Finally, Wisot testified that prior to February, 2001, he had not been instructed to cancel the plaintiff's insurance.

On appeal, the plaintiff does not assert that Ecoair failed to notify him regarding the continuation or termination of his health insurance premiums. In his brief, the plaintiff admits that he paid Ecoair for his health insurance coverage for the month of March, 2001, and that he thereafter notified Ecoair that he no longer would be purchasing insurance through the company.

After reviewing the entire record, we are not left with the definite and firm conviction that a mistake has been

claimed, however, that it was entitled to a setoff of $2130 for the amount it paid for health insurance benefits for the plaintiff for two months after his employment ended. Therefore, Ecoair agreed to pay the balance amount of $151.63 from the first payroll after trial.

made. We conclude that there was evidence to support the court's finding that Ecoair was entitled to offset its obligation for vacation pay by the amount of insurance benefits it paid on behalf of the plaintiff after the employment relationship between the parties ended. Consequently, we conclude that the court's finding to that effect was not clearly erroneous. Accordingly, we reject the plaintiff's third claim.

## IV

The plaintiff's final claim challenges the court's finding in favor of Knudsen on Knudsen's counterclaim. The plaintiff claims that the court improperly found that his promise to repay Knudsen was illusory and made in bad faith, and that his $78,000 debt to Knudsen was due and payable. As previously set forth, the repayment terms of the loan were that the $78,000 was due and payable without interest upon the sale of the plaintiff's Ecoair stock. The plaintiff argues that he has not sold any of his Ecoair stock since the time of the loan and, therefore, under the clear and undisputed repayment terms agreed upon by the parties, his repayment obligation has not yet been triggered.

In response, Knudsen does not contend that the plaintiff sold any shares of his Ecoair stock.[15] Instead, Knudsen argues, among other things, that notwithstanding the court's determination regarding the illusory nature of the plaintiff's promise, the court properly determined

---

[15] At oral argument on the appeal, Knudsen's counsel argued that the plaintiff's daughters' sale of stock triggered the plaintiff's repayment obligation because the plaintiff transferred the stock to his daughters *after* he received a substantial portion of the $78,000 loan, and his daughter's sale of those shares benefited the plaintiff. Subsequently, this court has determined that the argument advanced by Knudsen's counsel was not premised on a proper recitation of the facts. Following oral argument, Knudsen's counsel submitted a letter to this court dated September 17, 2002, conceding that the plaintiff did not transfer stock to his daughters after receiving any portion of the loan.

that the agreement between the parties failed to specify a definite time limit for the plaintiff's performance and, consequently, the court implied a reasonable time for performance. He maintains that the court properly found that the plaintiff had failed to repay the loan within a reasonable time, and concluded that the debt was due and payable. We agree.

In its memorandum of decision, the court concluded that the plaintiff's debt to Knudsen was due and payable on two grounds. First, it determined that the plaintiff's promise to repay Knudsen upon the sale of his stock was illusory.[16] Alternatively, the court found that the agreement between the parties failed to specify a definite time limit for the plaintiff's performance, and, therefore, the court implied into the agreement an obligation to repay the loan within a reasonable time. The court stated: "Even if one adopts the plaintiff's argument that the payment date arrives when the shares in the plaintiff's name are sold, in the absence of any specific time limit for that to occur, the loan should certainly be repaid within a reasonable time." The court found that the plaintiff enjoyed the use of the loaned funds for five years and that five years was a reasonable time. The court concluded that in "applying equitable principles, the debt is now due and payable."

"When the terms of a contract's time of performance are indefinite . . . [t]he result generally reached is that

---

[16] The court explained that an illusory promise exists when a condition of the contract is completely within the control of the promisor. The court determined that the condition in the parties' loan agreement—repayment upon the sale of stock—was wholly within the control of the plaintiff, the promisor. The court recognized that an implied obligation to use good faith is enough to avoid the finding of an illusory promise, citing *Sicaras v. Hartford*, 44 Conn. App. 771, 781, 692 A.2d 1290, cert. denied, 241 Conn. 916, 696 A.2d 340 (1997). The court stated, however, that it could not find that the plaintiff acted in good faith "in entering into the loan agreement which permitted him to unreasonably delay or totally avoid payment," and that "[i]t could not have been the intention of the parties when the loan was made to produce an inequitable result which shocks the conscience . . . ."

the time is neither unlimited nor discretionary. . . . [T]he promised performance must be rendered within a reasonable time." (Internal quotation marks omitted.) *DeCarlo & Doll, Inc.* v. *Dilozir*, 45 Conn. App. 633, 643, 698 A.2d 318 (1997). "What is a reasonable length of time is ordinarily a question of fact for the trier." *Parkway Trailer Sales, Inc.* v. *Wooldridge Bros., Inc.*, 148 Conn. 21, 26, 166 A.2d 710 (1960); see *Colby* v. *Burnham*, 31 Conn. App. 707, 715, 627 A.2d 457 (1993).

The present case is materially indistinguishable from *DeCarlo & Doll, Inc.* v. *Dilozir*, supra, 45 Conn. App. 633. In *DeCarlo & Doll, Inc.*, we held that when the terms of a contract's time for performance are indefinite, the promised performance must be rendered within a reasonable time. Id., 643. The plaintiff in *DeCarlo & Doll, Inc.*, sought to recover payment from the defendant under a contract pursuant to which the plaintiff performed engineering and technical services for development of the defendant's self storage facility. Id., 635–37. The defendant argued that his payment obligations under the contract were conditioned on his obtaining financing, which was an event that never occurred. Id., 637–38. The defendant maintained that the contract clause "[s]ubject to payment . . . at time of financing" excused his performance. Id. We explained that "the clause 'subject to payment . . . at time of financing' was not a condition on which payment was contingent." Id., 641. Rather, "[t]his clause set forth the time, which was in the sole control of the defendant, when payment was to be made by the defendant." Id. We determined that "this obligation was in the control of the defendant, and, therefore, he [would] not be excused by his nonperformance." Id., 642. Moreover, we concluded that "[b]ecause financing was never obtained by the defendant, the time of payment should have been within a reasonable time." Id., 643.

In the present case, the plaintiff argues, in essence, that his payment obligations under the loan agreement are conditioned or contingent on the sale of his Ecoair stock, which is an event that has not yet occurred. The court stated, however, that "[e]ven if one adopts the plaintiff's argument that the payment date arrives when the shares in the plaintiff's name are sold, in the absence of any specific time limit for that to occur, the loan should certainly be repaid within a reasonable time." The court's conclusion comports with our holding in *DeCarlo & Doll, Inc.* v. *Dilozir*, supra, 45 Conn. App. 643. Moreover, in the present case, the court made the factual finding that the plaintiff enjoyed the use of the loaned funds for five years and that five years was a reasonable time. In light of the record as a whole, we conclude that the court's finding that the plaintiff's debt was due and payable because a reasonable time had expired was not clearly erroneous. Accordingly, we reject the plaintiff's final claim.

As to the concerns expressed by the dissent, we respectfully note that we do not consider our application of *DeCarlo & Doll, Inc.*, in the present case to be an extension of that decision to individual employment contract situations. In the present case, there is no employment contract between Knudsen and the plaintiff; Knudsen both loaned the funds and brought the counterclaim in his personal, individual capacity. In addition, we respectfully disagree with other distinctions drawn by the dissent between *DeCarlo & Doll, Inc.*, and the present case. In the present case, as in *DeCarlo & Doll, Inc.*, it is uncertain whether the time for payment ever would arrive; in the present case, it is uncertain whether the plaintiff himself ever would decide to sell his stock, and in *DeCarlo & Doll, Inc.*, it was uncertain whether the defendant ever would receive financing. The dissent maintains that in the present case, the plaintiff's payment obligation must even-

tually arise because upon the plaintiff's death, there would be a sale or some other passing of title to the stock that is equivalent to a sale. We note that a transfer of title to the stock upon the plaintiff's death, by devise or through the intestacy laws, is not equivalent to a sale, and nothing in the record indicates that upon the plaintiff's death, the stock must be sold.

The judgment is affirmed.

In this opinion DUPONT, J., concurred.

FLYNN, J., dissenting in part. I concur with the affirmance of the judgment on the complaint. I respectfully dissent from the majority holding on the counterclaim found in part IV of the majority opinion. I would reverse the trial court's determination that the plaintiff's debt to the defendant Peter S. Knudsen, Jr., was due and payable.

I begin by expressing my opinion that permitting the counterclaiming Knudsen to demand payment of his note prior to the plaintiff's sale of his stock interest in his employer's corporation, which was the agreed on triggering event requiring payment, is unfair to the plaintiff. The plaintiff was induced to remain in employment at a salary reduced by $65,000 annually from what had been agreed between him and his employer, and did so until discharged. He should not be deprived of the loan terms for which he bargained which were the return consideration for that performance.

Second, I do not think *DeCarlo & Doll, Inc.* v. *Dilozir*, 45 Conn. App. 633, 698 A.2d 318 (1997), should be extended and applied to individual employment contract situations where money is lent to the employee and partial consideration in the form of accepting or, as in this case, continuing in employment has been received by the noteholder at the time of the loan. The plaintiff's agreement to remain in employment, and at

a lesser salary than agreed, was that partial consideration. In contrast, *DeCarlo & Doll, Inc.*, did not involve an individual employment contract. See id. That case is further distinguishable because it was not certain that the mortgage financing event triggering payment of that consideration to the plaintiff in that case would ever happen. Id., 643.

Third, I disagree with the trial court's holding that the promise to repay was illusory and find no justification for the court's imposing a "reasonable time" for payment to which the parties had not agreed. Maturity of the loan and the plaintiff's obligation to pay it in full, unlike the defendant's mortgage financing in *DeCarlo & Doll, Inc.*, is an event certain to happen even though the time of its triggering is not certain. This is so if for no other reason than that upon the death of the plaintiff borrower there would be a sale or some other passing of title to the stock equivalent to a sale which would trigger the obligation to repay principal.

In order to keep the plaintiff employed by the defendant corporation as a key executive officer in his company after reducing his annual pay by $65,000 per year, the defendant Knudsen, a majority stockholder, agreed to lend the plaintiff $6500 per month without interest, which was not to be paid until the plaintiff sold his stock. The plaintiff has never sold the stock. The defendant Knudsen got what he bargained for in that the plaintiff continued in employment at much less pay until his discharge and remained obligated to repay the note. There was nothing illusory about the plaintiff's performance. Unfortunately, if the judgment for the defendant on his counterclaim stands, there is something illusory in what the defendant promised. Instead of the debt maturing, as the parties agreed, only when the plaintiff sold his stock in the corporation which employed him, it is deemed due under the judgment in five years from the note date. This to me seems an

unfair result where continued employment and a pay "giveback" was induced by the agreement that was explicit about the future event that would trigger payment.